UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| E.R., *a minor with Olga Alcantara as her next of friend*, and **OLGA ALCANTARA**, *on her own behalf*, | § § § § | |
| *Plaintiffs*, | § | EP-18-CV-00298-DCG |
| v. | § § | |
| **MARCO JASSO**, *#1888*; **JOSE RIVAS**, *#2985*; **RICARDO VILLAGRAN**, *#2882*; and **JANE DOE**, | § § § § § | |
| *Defendants*. | § § | |

## MEMORANDUM OPINION AND ORDER

Presently before the Court are Defendant Jose Rivas's "Rule 12(b)(6) Motion to Dismiss Plaintiffs' First Amended Complaint and Demand for Jury Trial" (ECF No. 28) (hereinafter, "Rivas's Motion to Dismiss"), Defendant Marco Jasso's "Motion to Dismiss Plaintiffs' First Amended Complaint and Demand for Jury Trial" (ECF No. 29) (hereinafter, "Jasso's Motion to Dismiss"), and Defendant Ricardo Villagran's "Motion to Dismiss Plaintiffs' First Amended Complaint and Demand for Jury Trial" (ECF No. 30) (hereinafter, "Villagran's Motion to Dismiss"). For the reasons that follow, the Court **DENIES** these motions.

### I. BACKGROUND

**A. Facts**

The following facts derive from Plaintiffs E.R. and Olga Alcantara's "First Amended Complaint" (ECF No. 27) (hereinafter, "Amended Complaint") and, in this posture, are taken as true. *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012).

E.R. is a minor female (at the relevant time, she was sixteen years old), and Alcantara is her mother (collectively, "Plaintiffs"). Am. Compl. ¶¶ 5–6, 38, ECF No. 27. Rivas, Jasso, and

Villagran (collectively, "Moving Defendants") are employed by the El Paso Police Department: specifically, Rivas is a police officer, Villagran is a supervisory police officer, and Jasso is a sergeant and supervisory police officer. *Id.* ¶¶ 7–9, 41.

On November 26, 2016, E.R. was walking near her home on the 800 block of Pueblo Street in El Paso, Texas. *Id.* ¶ 14. While she was walking, Rivas approached her for no identifiable reason and asked for her identification. *Id.* ¶ 15. Rather than engaging with Rivas, E.R. turned to walk away. *Id.* ¶ 17. Before E.R. got more than a step or two away from Rivas, with her back to him, Rivas pulled E.R.'s hair, knocked her phone out of her hands, and kicked her in the left shin. *Id.* ¶ 18. E.R. replied that she wanted her mother present. *Id.* Rivas then forcefully threw her to the ground and proceeded to put his knee into her back and elbow her in the face. *Id.* ¶ 19. Rivas handcuffed E.R. and placed her in the back of his police car, with the assistance of Villagran. *Id.* ¶¶ 23, 67. E.R. sustained injuries to her knees, wrists, and cheek from the force used by Rivas. *Id.* ¶¶ 46–47.

While E.R. was handcuffed and in the car, a female police officer, Jane Doe, searched E.R.'s undergarments, removed her house key from inside of her bra, and handed the key to Rivas. *Id.* ¶¶ 26–27. Jasso and Villagran got into one of the two police cars present at the scene and drove to E.R.'s home. *Id.* ¶¶ 35–37. When they arrived at the home, Alcantara was in the shower. *Id.* ¶ 38. While she showered, the officers used the key they took from E.R. to enter the back door of Alcantara's home. *Id.* ¶ 39. When she exited the shower, she was confronted by the officers. *Id.* ¶ 40.

Alcantara then left her home and went to the scene where E.R. was detained. *Id.* ¶ 43. She provided E.R.'s personal information to the officers, and the officers released E.R. without charging her with a crime; by then, E.R. had been detained in the police car for over an hour. *Id.*

¶¶ 29, 45, 69. Alcantara called an ambulance, and E.R. was taken to the University Medical Center of El Paso, where she received treatment for the injuries she sustained. *Id.* ¶¶ 45–46.

Subsequently, Alcantara complained to the El Paso Police Department, which investigated some of her allegations asserted in the Amended Complaint. *Id.* ¶ 48. The investigation found the following violations: a detainment without reasonable suspicion by Rivas and Villagran; an arrest without probable cause by Rivas and Villagran; and an unlawful entry/search by Jasso and Villagran. *Id.* ¶ 48.

**B. Procedural History**

On October 9, 2018, E.R. and Alcantara (on her own behalf and as E.R.'s next friend) brought this lawsuit, under 42 U.S.C. §1983, against Rivas, Jasso, Villagran, and Doe—in their individual capacities—for violations of their rights secured by the Fourth and Fourteenth Amendments to the United States Constitution. *Id.* ¶¶ 1, 13. On January 3, 2019, Moving Defendants filed a first set of motions to dismiss (ECF Nos. 23, 24, 25). On January 17, 2019, Plaintiffs filed their Amended Complaint (ECF No. 27).

Between January 30 and February 1, 2019, Moving Defendants filed the instant, second set of motions to dismiss against Plaintiffs' Amended Complaint. Rivas's Mot. to Dismiss, ECF No. 28, Jasso's Mot. to Dismiss, ECF No. 29, Villagran's Mot. to Dismiss, ECF No. 30. On February 13, Plaintiffs filed their "Joint Response in Opposition to Defendants' Motions to Dismiss" (ECF No. 33) (hereinafter, "Plaintiffs' Response"). Moving Defendants followed by filing their replies. *See* Rivas's Reply Br. in Support of his Rule 12(b)(6) Mot. To Dismiss [hereinafter, "Rivas's Reply"], ECF No. 37; Jasso's Reply to Pls.' Resp. to Mots. to Dismiss [hereinafter, "Jasso's Reply"], ECF No. 38; Villagran's Reply to Pls.' Resp. to Mots. to Dismiss [hereinafter, "Villagran's Reply"], ECF No. 39.

On March 21, 2019, the Honorable United States District Judge Frank J. Montalvo, who then presided over this case, issued a Scheduling Order (ECF No. 40). After Judge Montalvo recused from the case, *see* Order of Recusal, ECF No. 43, the case was reassigned to the undersigned judge on April 11. On May 30, Moving Defendants jointly moved to stay the Scheduling Order deadlines until such time as this Court decides the instant motions to dismiss, *see* J. Mot. for Temporary Stay of Ct.'s Scheduling Order Deadlines, ECF No 45, and the Court granted the motion, *see* Text Order (June 6, 2019).

## II. STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a party to seek dismissal of a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet the "facial plausibility" standard, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court's task, then, is "to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 854 (5th Cir. 2012) (en banc). "Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

On a Rule 12(b)(6) motion, the court "must accept all well-pleaded facts as true, draw all inferences in favor of the nonmoving party, and view all facts and inferences in the light most favorable to the nonmoving party." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual

proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotes and citations omitted). "*Iqbal* does not allow us to question the credibility of the facts pleaded . . . . *Iqbal*, instead, tells us to assume the veracity of well-pleaded factual allegations." *Ramirez v. Escajeda*, 921 F.3d 497, 501 (5th Cir. 2019) (alteration, internal quotes, and citations omitted).

Finally, in deciding the motion, "a district court may not go outside the complaint." *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 (5th Cir. 2012) (internal quotes and citations omitted). The court may, however, "rely on documents incorporated into the complaint by reference[] and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (internal quotes and citations omitted).

### III. DISCUSSION

Plaintiffs assert the following claims for violations of their Fourth Amendment rights. Against Rivas, E.R. asserts claims for unlawful detention and/or arrest, Am. Compl. ¶¶ 60–73, and excessive force, *id.* ¶¶ 74–85. E.R. also asserts a claim—under the supervisor liability theory—against Villagran for the unlawful detention and/or arrest allegedly committed by Rivas. *Id.* ¶¶ 53, 56, 60; Pls.' Resp. at 5–6. Alcantara, on the other hand, asserts claims for unlawful entry and/or search of her home against Villagran and Jasso. Am. Compl. ¶¶ 104–112. Alcantara also asserts a claim—under the supervisor liability theory—against Jasso for the unlawful entry or search allegedly committed by Villagran. *Id.* ¶¶ 54, 57–59, 104; Pls.' Resp. at 9.

By his motion, Rivas asks the Court to dismiss E.R.'s claims against him for failure to state a claim and on the qualified immunity ground. Rivas's Mot. to Dismiss at 9. Villagran and

Jasso ask the Court to dismiss Plaintiffs' claims against them on the qualified immunity ground. Villagran's Mot. to Dismiss at 4, 11; Jasso's Mot. to Dismiss at 4, 9.

To state a claim under 42 U.S.C. § 1983, "a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law."[1] *Doe ex rel. Magee*, 675 F.3d at 854. At the motion to dismiss stage, if a defendant invokes qualified immunity, an affirmative defense, the burden shifts to the plaintiff to plead facts that demonstrate the inapplicability of the defense. *Club Retro, L.L.C.*, 568 F.3d at 194; *Shaw v. Villanueva*, 918 F.3d 414, 416–17 (5th Cir. 2019). To discharge this burden, she must "plead[] facts showing (1) that the official violated a . . . constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Wood v. Moss*, 572 U.S. 744, 757 (2014) (internal quotes and citations omitted).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015); *see also Wood*, 572 U.S. at 758 ("The dispositive inquiry . . . is whether it would have been clear to a reasonable officer in the [defendants'] position that their conduct was unlawful in the situation they confronted." (alteration, internal quotes, and citation omitted)). "A right may be clearly established without a case directly on point," *Hanks v. Rogers*, 853 F.3d 738, 746–47 (5th Cir. 2017) (internal quotes and citations omitted), and "despite notable factual distinctions between the precedents relied on and the case[] then before the [c]ourt," *Shumpert v. City of Tupelo*, 905 F.3d 310, 321 (5th Cir. 2018) (same), but "existing precedent must have placed the . . . constitutional question beyond debate," *Hanks*, 853 F.3d at 747 (same); *see also*

---

[1] Plaintiffs have sufficiently alleged that at the relevant time, the Moving Defendants were acting under the color of state law. *E.g.*, Am. Compl. ¶¶ 8–10; 12–13, 52, 64.

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." (internal quotes and citations omitted)).

As a preliminary matter, although Moving Defendants invoke qualified immunity, they do not address Plaintiffs' arguments on the second prong of the qualified immunity analysis. *See* Pls.' Resp. at 10–11. In their reply briefs, Villagran and Jasso state that they do not contend that Plaintiffs' Fourth Amendment rights did not exist at the time of the alleged incident; instead, they contend only that Plaintiffs have failed to sufficiently plead facts to show that the officers violated those rights. Villagran's Reply at 5, ECF No. 39; Jasso's Reply at 5–6, ECF No. 38. Rivas, on the other hand, submits a reply brief that is nearly identical (both in form and content) to his opening brief. *Cf.* Rivas's Mot. to Dismiss, ECF No. 28, *with* Rivas's Reply, ECF No. 37.

## A. E.R.'s Claims against Rivas

### 1. Unlawful Detention and/or Unlawful Arrest

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. There are three tiers of citizen-police contact for purposes of the Fourth Amendment seizure analysis. *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014). The first is "mere communication between a citizen and an officer, involving no element of detention or coercion"; it "does not implicate the [F]ourth [A]mendment." *United States v. Hanson*, 801 F.2d 757, 761 (5th Cir. 1986). The second is an investigative detention, also called a *Terry* stop, which is "a brief seizure that must be supported by reasonable suspicion." *Massi*, 761 F.3d at 520 (internal quotes and citations omitted); *see also Goodson v. City of Corpus*

*Christi*, 202 F.3d 730, 736 (5th Cir. 2000). And the third is "a full scale arrest which must be supported by probable cause." *Massi*, 761 F.3d at 520 (alteration, internal quotes, and citations omitted). "This three-tiered approach presents this [C]ourt with two questions: [(1)] *when* were the defendants 'seized' within the meaning of the [F]ourth [A]mendment and [(2)] *which* tier does that seizure occupy?" *Hanson*, 801 F.2d at 761.

Turning to the first question, "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *INS v. Delgado*, 466 U.S. 210, 216 (1984). A seizure occurs when "'all the circumstances surrounding the incident' are such that 'a reasonable person would have believed that he was not free to leave.'" *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014) (quoting *INS*, 466 U.S. at 215); *see also Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person."). Here, based on the facts alleged, when Rivas "threw" E.R. to the ground, *see* Am. Compl. ¶ 19, E.R. was seized within the meaning of the Fourth Amendment. *See United States v. Berry*, 670 F.2d 583, 592 (5th Cir. Unit B 1982) (en banc) ("We agree . . . with Justice Stewart's interpretation of [*Brown v. Texas*, 443 U.S. 47 (1979)] as holding that there was a seizure not at the initial contact between Brown and the police but at the subsequent detention after Brown refused to talk to the police." (citing *United States v. Mendenhall*, 446 U.S. 544, 556 (1980) (Stewart, J.) (plurality opinion))); *see also California v. Hodari D.*, 499 U.S. 621, 629 (1991) ("In sum, assuming that [the police officer's] pursuit . . . constituted a 'show of authority' enjoining [the defendant] to halt, since [the defendant] did not comply with that injunction he was not seized until he was tackled."). Rivas then further restrained E.R. by handcuffing her and placing her in the police car. Am. Compl. ¶¶ 23, 29.

-8-

Turning to the second question, on the facts alleged here, the seizure could be classified as a detention requiring reasonable suspicion and an arrest requiring probable cause. *See Lincoln v. Turner*, 874 F.3d 833, 841 (5th Cir. 2017) (observing that the boundary between an investigatory stop and an arrest can be blurred). The Court therefore addresses first whether the officers had reasonable suspicion[2] or probable cause[3] at the moment E.R. was seized. *See Hill*, 752 F.3d at 1033 (A "seizure" must be justified at its inception.). The allegations plausibly suggest that E.R. was not engaged in any criminal activity, and Rivas and Villagran[4] had no knowledge that E.R. committed any offense. *See e.g.*, Am. Compl. ¶¶ 15, 65, 68. Moreover, the Amended Complaint further alleges, the El Paso Police Department's investigation of this incident concluded that Rivas and Villagran lacked reasonable suspicion and probable cause. Am. Compl. ¶ 48; *see also Hanks*, 853 F.3d at 745 n.3 (considering the findings of police department's internal investigation in assessing whether the Fourth Amendment was violated); *Grant v. City of Houston*, 625 F. App'x 670, 677 (5th Cir. 2015) (same). The Court therefore concludes, based on the facts alleged, that Rivas and Villagran lacked reasonable suspicion to detain E.R. and probable cause to arrest her.

The Court further concludes that the Amended Complaint sufficiently alleges a detention without reasonable suspicion and, more appropriately, an arrest without probable cause. The *Terry* "standard is a two–tiered reasonable suspicion inquiry: 1) *whether the officer's action was*

---

[2] *See United States v. Rodriguez*, 564 F.3d 735, 740–41 (5th Cir. 2009) ("Temporary, warrantless detentions of individuals constitute seizures for Fourth Amendment purposes and must be justified by reasonable suspicion that illegal activity has or is taking place.").

[3] *See Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) ("Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." (internal quotes and citations omitted)).

[4] To avoid duplicative analysis—in later discussing E.R.'s supervisor liability claim against Villagran—the Court here simultaneously addresses whether Villagran had reasonable suspicion or probable cause.

*justified at its inception*, and 2) whether the . . . seizure was reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003)). The detention was unlawful, at minimum, because the officers lacked the requisite reasonable suspicion.

Moreover, "[a] seizure rises to the level of an arrest only if a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Turner v. Lieutenant Driver*, 848 F.3d 678, 692–93 (5th Cir. 2017) (internal quotes and citations omitted). The Amended Complaint alleges that as E.R. turned to walk away, Rivas pulled her hair, kicked her in her left shin, threw her to the ground, and proceeded to put his knee into her back and elbow her in the face. *Id.* ¶¶ 18–19. Rivas handcuffed E.R. and placed her in the back of his police car, where she was detained for over an hour. *Id.* ¶¶ 23, 29, 67. Based on these allegations, a reasonable person in E.R.'s situation would have believed that she had been restrained to an extent that normally accompanies a formal arrest. *See Morris v. Noe*, 672 F.3d 1185, 1192 (10th Cir. 2012) (concluding that the defendant police officer's action in "throwing down" the plaintiff—"despite the fact [the plaintiff] presented no threat to officer safety and had not engaged in any suspicious activity"—constituted a full custodial arrest); *cf. Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007) (holding that an arrest occurred where police handcuffed a woman's hands behind her back and placed her in a police car for 30 to 45 minutes). E.R., therefore, has stated constitutional claims on the basis of unlawful detention and unlawful arrest, and thereby, carried her burden on the first prong of the qualified immunity analysis.

So has E.R. on the second prong. The Fourth Amendment rights to be free from detention without reasonable suspicion and from arrest without probable cause were clearly

established at the time of E.R.'s seizure. *Club Retro, L.L.C.*, 568 F.3d at 206; *Ibarra v. Harris Cty. Tex.*, 243 F. App'x 830, 833 (5th Cir. 2007) (citing *Brown*, 443 U.S. 47 at 51)). Based on the factual allegations, all that happened up to the moment of E.R.'s seizure was that Rivas asked for identification, but E.R. refused and turned to walk away. "[T]he Supreme Court has made it abundantly clear that unless a police officer has reasonable suspicion to conduct an investigatory stop," not so here based on the facts alleged, "an 'individual has a right to ignore the police and go about his business.'" *United States v. Monsivais*, 848 F.3d 353, 360 (5th Cir. 2017) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). "Under the Fourth Amendment, police officers may not require identification absent an *otherwise* lawful detention or arrest based on reasonable suspicion or probable cause." *Johnson v. Thibodaux City*, 887 F.3d 726, 733 (5th Cir. 2018) (emphasis added) (citing *Brown*, 443 U.S. at 52–53).[5] Nor can the police "arrest an individual solely for refusing to provide identification." *Turner*, 848 F.3d at 695 (citing, among others, *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 188 (2004)).

Moreover, the Texas statute that criminalizes an individual's refusal to identify[6] requires a "lawful[] arrest[]" *prior to* the act of refusal, *see* Tex. Penal Code Ann. § 38.02(a) ("A person commits an offense if he intentionally refuses to give his name . . . to a peace officer who has *lawfully arrested* the person and requested the information." (emphasis added)), but E.R. "was not under arrest at the time she refused to give her information," *Huang v. Harris Cty.*, 264 F.3d

---

[5] *See also INS*, 466 U.S. at 216–17 ("But if the person[] refuses to answer and the police take additional steps—such as those taken in *Brown*—to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention.").

[6] Rivas appears to argue that by refusing to identify, E.R. violated a criminal statute, though he does not specify the statute. *See, e.g.*, Rivas's Mot. to Dismiss at 8 ("Plaintiffs further conclude that E.R. did not display any criminal behavior. However, Plaintiffs' Amended Complaint again establishes that E.R. was asked for her identification and refused to provide that information or cooperate and instead chose to flee." (citing Am. Compl. ¶¶ 15, 17, 78)). The Court assumes Rivas relies on § 38.02(a) of Texas Penal Code.

1141, 2001 WL 822534, at *7 (5th Cir. 2001) (unpublished). On the facts alleged in the Amended Complaint, the Court concludes that no reasonable officer in Rivas's or Villagran's position could have believed the detention and arrest to be lawful in light of clearly established law.[7] Rivas is not entitled to qualified immunity on E.R.'s unlawful detention and unlawful arrest claims.

## *2. Excessive Force*

"When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). To state a claim for excessive force, a plaintiff's complaint must allege that "she suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force was objectively unreasonable." *Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2018) (internal quotes and citations omitted). "The second and third elements collapse into a single objective-reasonableness inquiry, guided by the following *Graham* factors: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Peña v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018) (internal citations omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Here, E.R. alleges that she sustained physical injuries to her knees, wrists, and cheek, and mental and emotional injuries, which proximately resulted from Rivas's use of force. Am. Compl. ¶¶ 46–4, 77. Hence, the injury element is sufficiently alleged. Turning to the *Graham* factors, first, even if E.R.'s refusal to identify were a violation of Texas's failure to identify statute, the statute classifies such conduct as a Class C misdemeanor, *see* Tex. Penal Code Ann. §

---

[7] That conclusion is further supported by the allegation that the El Paso Police Department's investigation of the incident, which found that Rivas and Villagran unlawfully detained and arrested E.R. Am. Compl. ¶ 48; *see Hanks*, 853 F.3d at 745 n.3, *supra*; *Grant*, 625 F. App'x at 677, *supra*.

-12-

38.15(c)(1), which is a minor offense militating against the use of force, *Westfall*, 903 F.3d at 547–48. Second, the complaint alleges that E.R., a minor female who was sixteen years old at the time, did not display any threatening or aggressive behavior "whatsoever" and was not a threat to Rivas and other officers at the scene. Am. Compl. ¶¶ 21, 78.

Third, drawing all inferences in favor of E.R. and construing all facts and inferences in the light most favorable to E.R., *see Club Retro, L.L.C.*, 568 F.3d at 194, the facts alleged in the Amended Complaint plausibly suggest that E.R., a minor, did not want to engage with Rivas without her mother's presence, not that, as Rivas claims, she was attempting to flee. *Cf.* Rivas's Mot. to Dismiss at 8. Specifically, E.R. alleges that after Rivas asked for her identification, E.R. turned to walk (not run) away from Rivas, merely took two steps away (at which point, Rivas pulled her hair, knocked her phone out of her hands, and kicked her in the left shin), and replied that she wanted her mother present. Am. Compl. ¶¶ 17–18. At the motion-to-dismiss stage, the Court is not allowed "to question the credibility of the facts pleaded" in the Amended Complaint. *Ramirez*, 921 F.3d at 501; *see also Baker v. Putnal*, 75 F.3d 190, 196–97 (5th Cir. 1996) (holding that the trial court erred by failing to accept as true plaintiff's allegation when it "adopted portions of the defendants' claims as fact without acknowledging any contradiction with the complaint") (a case involving the qualified immunity issue).

Moreover, her conduct amounted to, at most, passive resistance counseling against the use of force. *See Deville v. Marcantel*, 567 F.3d 156, 167, 169 (5th Cir. 2009) (the plaintiff's refusal to exit her car and be separated from her grandchildren until her husband arrived on the scene constituted passive resistance); *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017) ("[W]here an individual's conduct amounts to mere 'passive resistance,' use of force is not justified."). Further, it can be reasonably inferred from the factual allegations that only a few

moments elapsed between E.R.'s turning away from Rivas and being thrown to the ground. Am. Compl. ¶¶ 15–19, 66, 76; *see also Trammell*, 868 F.3d at 342 ("[T]he speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need." (citing *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (holding that disputes of fact were material because a reasonable jury could find that the degree of force used was not justified where the officer engaged in very little, if any, negotiation with the suspect and instead quickly resorted to force))).

Accordingly, based on the facts alleged, E.R.'s refusal to identify did not justify Rivas's decision to throw E.R. to the ground and the force used by Rivas was objectively unreasonable. *See Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (concluding on the facts alleged, officers' use of force was objectively unreasonable, where plaintiff was not a flight risk and did not pose any risk of harm, but the officers threw him "onto the ground, knee[d] him in the back, and push[ed] his face into the concrete" for his refusal to exit his car on command). Accordingly, the Court concludes that E.R. has stated a constitutional claim on the basis of excessive force. Moreover, when E.R. was detained and arrested, E.R. "had a clearly established right to be free from excessive force, and it was clearly established that the permissible degree of force depends on the *Graham* factors." *Westfall*, 903 F.3d at 549. Rivas is not entitled to qualified immunity on E.R.'s excessive force claim.

## B. E.R.'s Supervisor Liability Claim against Villagran

In order to establish supervisor liability for constitutional violations committed by subordinate employees, a plaintiff must show, as relevant here, that the supervising personnel was "personally involved" in the alleged constitutional violations. *Turner*, 848 F.3d at 695–96; *Peña*, 879 F.3d at 620. To show personal involvement, the supervisor must know about the

violation and personally direct the violation, facilitate it, approve it, condone it, turn a blind eye to it for fear of what he might see, or acquiesce in its continuance. *Turner*, 848 F.3d at 696 & n.88 (citing *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012); *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996)).

Here, the Amended Complaint refers to Rivas as a police officer and Villagran as a supervisory police officer. Am. Compl. ¶¶ 8–9. It further states that although Rivas was the primary offender, Villagran was right there watching it happen and assisted Rivas in placing E.R. in the back of the police car. Am. Compl. ¶¶ 22–23. As discussed, *see* Part III.A.1, *supra*, Villagran lacked reasonable suspicion and probable cause and thus, knew about the constitutional violations. E.R. therefore has sufficiently alleged a claim for supervisor liability against Villagran for the unlawful detention and arrest committed by Rivas. Further, the allegations in the Amended Complaint do not permit a conclusion that Villagran acted objectively reasonably under the circumstances. *Cf. Turner*, 848 F.3d at 696 ("Even if Turner had sufficiently alleged a constitutional violation, Driver acted objectively reasonably in light of the circumstances—namely, by apprising himself of the situation and acting accordingly."). Villagran is not entitled to qualified immunity on E.R.'s supervisor liability claim.

## C. Alcantara's Claims for Unlawful Entry or Search against Villagran and Jasso

"[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). "At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Id.* (internal quotes and citations omitted); *see also United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."). "A warrantless entry into a home is

presumptively unreasonable," *United States v. Silva*, 865 F.3d 238, 241 (5th Cir. 2017), unless one of "a few specifically established and well-delineated exceptions" applies. *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 760 (2010) (internal quotes and citations omitted). One exception is the existence of exigent circumstances, which include the need "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 421 (5th Cir. 2008) (internal quotes and citations omitted). However, police "[o]fficers cannot manufacture exigency through their own action or inaction." *Linicomn v. Hill*, 902 F.3d 529, 536 (5th Cir. 2018).

Here, Alcantara alleges that the officers entered her home without a warrant and that she "was confronted by the officers when she exited the shower." Am. Compl. ¶¶ 39, 40, 42. Alcantara has sufficiently alleged a plausible constitutional violation on the basis of the entry.

Villagran and Jasso, however, argue that her claim fails for two reasons. First, they argue that there was no specific damage or injury to Alcantara as a result of the intrusion. *E.g.*, Jasso's Mot. to Dismiss. at 6. To the contrary, the Amended Complaint alleges that she sustained "mental, emotional injury and pain, mental anguish, humiliation, and embarrassment" as a proximate result of their unconstitutional acts. Am. Compl. ¶ 112; *see also Franks v. Smith*, 717 F.2d 183, 186 (5th Cir. 1983) ("As to damages, compensation may be appropriate where embarrassment or mental distress result from deprivation of constitutional rights, as is alleged here[,]" including "an invasion of the [plaintiffs'] home without a warrant in violation of the [F]ourth [A]mendment."). Second, they argue that there was no violation of the Fourth Amendment because they did not, and were not there to, inspect any property or arrest anyone while they were inside the home. *E.g.*, Jasso's Mot. to Dismiss at 6–7. They rely on *Artes-Roy v. City of Aspen*, 31 F.3d 958 (10th Cir. 1994).

In *Artes-Roy*, a city building inspector observed from the street that construction activity continued at the plaintiff's home, against which he had issued a stop work order for violations of the building code. *Artes-Roy*, 31 F.3d at 962. The inspector told several workers on the roof that they were violating the order. *Id.* at 960. Intending to inform the workers inside the home of the stop work order, he then went to the front door of the house, pushed open the door, and stepped into the entryway—without warrant or proper consent. *Id.* at 960–62. The Tenth Circuit panel noted that the inspector was not on the premises "to inspect for a violation of the building code," as he "had already seen what [he] considered violations of the stop work order, from outside the premises." *Id.* at 962. Nor did he "intend to make any arrest on the premises," observed the panel. *Id.* The panel concluded that there were no search or seizure, and therefore, no violation of the Fourth Amendment occurred by the inspector's entry into the home. *Id.*

The rationale underlying *Artes-Roy*, as the Tenth Circuit points out in a recent case, was that "'[a] different rule [i.e., concluding the defendant's entry onto plaintiff's property was a search in violation of the Fourth Amendment] would subject to liability every public official who *inadvertently* . . . steps inside the door of a private residence.'" *Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 843 (10th Cir. 2005) (alterations in original) (emphasis added) (quoting *Artes-Roy*, 31 F.3d at 962); *see also id.* (distinguishing *Artes-Roy* on the basis that the entries at issue "were intentional, uninvited, and in furtherance of an inspection").

On the facts alleged in the Amended Complaint, this case is distinguishable from *Artes-Roy*. After E.R. refused to identify herself without her mother's presence, Am. Compl. ¶¶ 18, 67, Villagran and Jasso drove to E.R.'s home and used the key that was taken from her to enter the back door of Alcantara's home, *id.* ¶¶ 26, 35–39. Subsequently, when Alcantara went to the scene where E.R. was detained and provided E.R.'s personal information to the officers, E.R.

-17-

was released. *Id.* ¶¶ 43–45, 69. These allegations plausibly suggest that Villagran and Jasso intentionally (not inadvertently) entered the home to look for E.R.'s mother or things (papers or effects) for the purpose of obtaining E.R.'s identification. Moreover, unlike the *Artes-Roy* inspector who merely stepped into the entryway, Alcantara "was confronted by the officers when she exited the shower." *Id.* ¶ 40. Based on the facts alleged, therefore, Villagran and Jasso were inside the home in furtherance of a search. *See United States. v. Jones*, 565 U.S. 400, 404–05 (2012) (When the government "physically occupie[s] private property for the purpose of obtaining information," a Fourth Amendment search occurs.); *United States v. Paige*, 136 F.3d 1012, 1018 (5th Cir. 1998) ("[I]f governmental 'activity intrudes upon a reasonable expectation of privacy in a significant way' . . . the activity constitute[s] a 'search' for Fourth Amendment purposes." (quoting *United States v. York*, 895 F.2d 1026, 1028 (5th Cir.1990))); *Wernecke v. Garcia*, 591 F.3d 386, 393 (5th Cir. 2009) ("Garcia indisputably engaged in a search when she entered the Werneckes' home to look for KW.").[8]

Accordingly, Alcantara has stated a constitutional claim on the basis of unlawful entry and search. Further, the alleged facts do not give rise to an inference that there existed exigent circumstances requiring an immediate entry into Alcantara's home. *Cf. United States v. Troop*, 514 F.3d 405, 410 (5th Cir. 2008) (concluding that no exigent circumstances existed where officers tracked a group of illegal aliens to a house and entered the house, while the occupants were asleep, finding no evidence that the aliens needed immediate medical aid). Under the circumstances alleged, therefore, no reasonable officer could have believed that he could enter Alcantara's home in light of the clearly established law at the time of the entry. *See, e.g., Groh*

---

[8] *See also Kyllo v. U.S.*, 533 U.S. 27, 32 n.1 (2001) ("When the Fourth Amendment was adopted, as now, to 'search' meant '*to look* . . . through for the purpose of finding something; as, to *search* the house for a book; to *search* the wood for a thief.'" (first emphasis added) (alteration omitted) (quoting N. Webster, An American Dictionary of the English Language 66 (1828) (reprint 6th ed. 1989))).

*v. Ramirez,* 540 U.S. 551, 564 (2004) ("No reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional."); *O'Connor v. Ortega,* 480 U.S. 709, 720 (1987) ("It is settled that except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." (brackets, ellipses, internal quotes, and citations omitted)). Villagran and Jasso are not entitled to qualified immunity on Alcantara's unlawful entry and search claim.

## D. Alcantara's Supervisor Liability Claim against Jasso[9]

Although the Amended Complaint refers to Villagran and Jasso each as a supervisory police officer, it additionally states that Jasso is a "sergeant." Am. Compl. ¶¶ 7, 9, 41. From this, the Court infers that Villagran is subordinate to Jasso. The Court further infers from the use of "stamp of approval," Am. Compl. ¶ 59, that Jasso approved of Villagran's conduct. Therefore, and in view of the discussion in Part III.C, *supra*, the Court concludes that Alcantara has stated a supervisor liability claim against Jasso for the unconstitutional entry/search committed by Villagran. *See Peña*, 879 F.3d at 620–21 (stating "[w]e infer from the inclusion of his title, 'Lieutenant,' and the use of 'order,' that Solis was in a position to direct Salinas to use the taser against Peña[,]" and concluding that the proposed amended complaint stated a claim against Lieutenant Solis under the supervisor liability theory); *see also Turner*, 848 F.3d at 696 & n.88, *supra* (a supervisor is personally involved, for supervisor liability purposes, if he

---

[9] Jasso expresses doubt whether Alcantara continues to assert a supervisor liability claim against him because she included a separate count for this claim in the original complaint, but omitted that count in the Amended Complaint. Jasso's Mot. to Dismiss at 7–8. In the Amended Complaint, she sets out her statements of the claim in the "Factual Background" section under the heading "supervisory liability," Am. Compl. ¶¶ 50–52, 54, 57–59, and incorporates them by reference under Count V, her claim for unlawful entry/search, *id.* ¶ 104. This she is permitted to do under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim . . . alternatively . . . , either in a single count . . . or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.").

approves the subordinate's unconstitutional conduct). Further, the allegations in the Amended Complaint do not permit a conclusion that Jasso, as Villagran's supervisor, acted reasonably under the circumstances. *Cf. Turner*, 848 F.3d at 696, *supra*. Jasso is not entitled to qualified immunity on Alcantara's claim against him under the supervisor liability theory.

## IV. CONCLUSION

In sum, the Court concludes that Plaintiffs have "nudged their claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, and sufficiently pleaded facts that demonstrate the inapplicability of Defendants Rivas, Villagran, and Jasso's defense of qualified immunity. The Court echoes the Fifth Circuit:

> We have only heard one side of the story. After discovery is complete, the district court may well correctly determine that none of [the plaintiff's] claims can survive summary judgment. But at the motion to dismiss stage, we are bound to accept his allegations as true. And on the facts alleged, [the plaintiff] has stated several constitutional claims.

*Alexander*, 854 F.3d at 309.

**IT IS ORDERED** that Defendant Jose Rivas's "Rule 12(b)(6) Motion to Dismiss Plaintiffs' First Amended Complaint and Demand for Jury Trial" (ECF No. 28), Defendant Marco Jasso's "Motion to Dismiss Plaintiffs' First Amended Complaint and Demand for Jury Trial" (ECF No. 29), and Defendant Ricardo Villagran's "Motion to Dismiss Plaintiffs' First Amended Complaint and Demand for Jury Trial" (ECF No. 30) are **DENIED**.

So ORDERED and SIGNED this 26th day of July 2019.

DAVID C. GUADERRAMA
**UNITED STATES DISTRICT JUDGE**