## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **E.R.**, *a minor*, and **OLGA ALCANTARA**, *as E.R.'s next of friend and on her own behalf*, | § § § § | |
| *Plaintiffs*, | § | **EP-18-CV-00298-DCG** |
| **v.** | § § | |
| **MARCO JASSO**, *#1888*; **JOSE RIVAS**, *#2985*; **and RICARDO VILLAGRAN**, *#2882*, | § § § § | |
| *Defendants*. | § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

It was around midday on a Thanksgiving weekend.  A mother (Olga Alcantara) was helping her two minor daughters shower in her bathroom; no one else was inside her home.  A male voice shattered the peaceful family time.  Stepping out to see who that was, she saw two police officers, in uniform, standing in her dining room.  The officers had entered her home through a backdoor, unlocking it with a key they found in a teenager's bra; that's the mother's third daughter; the daughter was held in handcuffs a block away from the home.

The mother brought this civil rights action, claiming that the officers violated her Fourth Amendment rights to be secure in her house against unreasonable searches.  At this stage of the litigation, the officers request that the Court dismiss her claim—as a matter of law.  And that is because, they say, they are entitled to "qualified immunity"—a judicially-created venerable doctrine that shields from liability, for money damages, all but the plainly incompetent officers.  If their request is granted, that would deprive the mother of her day in court and the opportunity to learn what a jury of this community would think about these events.

More than two decades ago, the Supreme Court wrote the Fourth Amendment embodies the centuries-old principle that "'the house of every one is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose.'" *Wilson v. Layne*, 526 U.S. 603, 609–10 (1999) (quoting an early 1600's opinion by an English court). As explained below, the officers' entry into the mother's home was, clearly, an affront to that basic principle. Their request is denied. This mother gets to present her case to a jury.

## I.   BACKGROUND

### A.  Factual Background[1]

The Court begins with an introduction of the relevant characters. Jose Rios (formerly known as Jose Rivas),[2] Ricardo Villagran, and Marco Jasso (collectively, Defendants) are officers of the El Paso Police Department. At the relevant time, they had, respectively, three, five, and twenty years of experience as police officers.[3] Since 2008, Jasso has been a police sergeant, and in that role, he supervises, on a daily basis, officers out in the field.[4]

Alcantara's three daughters are: Evelyn Ramirez or E.R.,[5] who is also a plaintiff in this case (we will refer to her simply as Evelyn), L.A., and Z.A. At the relevant time, Evelyn was

---

[1] Because of the summary judgment stance, this recitation takes facts in the light most favorable to Plaintiffs. *See Starnes v. Wallace*, 849 F.3d 627, 630 n.1 (5th Cir. 2017).

[2] During the course of this litigation, Defendant Jose legally changed his last name from Rivas to Rios. Thus, Rios and Rivas refer to the same person.

[3] Rios's Exs. at 3 (Rios's affidavit), ECF No. 78-1; Villagran Aff. at 1–2, ECF No. 88-1; Jasso Aff. at 1–2, ECF No. 82-2. Citations to Rios's exhibits, which were filed as a single document (ECF No. 78-1), refer to the page numbers imprinted thereon by the Court's Case Management and Electronic Case Filing system.

[4] Jasso Dep. at 5:3–19, ECF No. 82-3.

[5] At the time the lawsuit was filed, Evelyn was a minor, and therefore, the case style reflects her name as "E.R."

sixteen years old, a sophomore in high school, and an "A" and "B" student.[6]   L.A. and Z.A. were eleven and nine years old, respectively.[7]   Alcantara, who has a culinary school degree, supported herself and the daughters by selling foods that she made at home.[8]

At the time, Alcantara and the daughters lived at 830 Mission Road, El Paso, Texas.[9] The property comprises a small home, a front yard facing Mission Road, a back yard, and a driveaway on one side of the home that stretches from the front to the back.[10]   At the end of the driveway, there is a gate to the back yard.[11]   The home can be entered through a front door from the front yard and a back door from the back yard.[12]   Inside the home, there are two bedrooms and one bathroom, which are located along a hallway.[13]   The daughters slept in one bedroom, and Alcantara in the other.[14]   The hallway leads to a living room, which is connected, and open, to a dining area in the back of the home, and at the end of the dining area is the backdoor for entry from the back yard.[15]

---

[6] Alcantara at 9:16–21, 56:3–4, 127:17–18, ECF No. 82-4; Evelyn Dep. at 7:13, 13:23–25, 23:25–24:6, ECF No. 94-2.

[7] Alcantara Dep. at 9:16–21;  Evelyn Dep. at 36:24–37:3.

[8] Alcantara Dep. at 12:3–9, 50:10–51:15.

[9] *Id.* at 7:15–23.

[10] *Id.* at 59:8–12, 63:8–12, 86:19–22, 139:17–140:6; Evelyn Dep. at 36:14–18; Rios Dep. at 31:22–32:6, ECF No. 94-3.

[11] Alcantara Dep. at 139:17–140:6; Rios Dep. at 31:22–32:6.

[12] Alcantara Dep. at 63:8–12; Evelyn Dep. at 59:14–60:4; Rios's Exs. at 83 (a photo).

[13] *See* Alcantara Dep. at 54:12–13, 70:6–17, 72:3–23, 73:5–12.

[14] *Id.* at 54:17–19.

[15] *Id.* at 70:6–72:2; Evelyn Dep. at 59:20–60:5; Rios's Exs. at 83.

The events giving rise to this lawsuit occurred on November 26, 2016, a Saturday, two days after Thanksgiving day.  Early in the morning of the 26th, Evelyn and her sisters cleaned the yards, picked up trash (such as candies and candy wrappers), and put them inside a trash can located in the back yard.[16]  The trash can was filled to the brim.[17]  That week, the city's trash collectors were late and had not yet come to pick up the trash because of the Thanksgiving holiday.[18]  On the day before, November 25, Alcantara's brother, cousins, and other members of her family came to the home for a family get-together; some of the adult guests consumed alcohol.[19]  Empty cans and boxes of alcoholic beverages were placed inside the trash can.[20]

Alcantara woke up around 7 a.m. (November 26).[21]  She had plans to attend a "Friendsgiving" event later that day at a friend's house.[22]  In the morning, she was making pumpkin pies, some for the Friendsgiving event and some to sell.[23]  She was going back and forth to her friend's house—a short drive away.[24]  She was in a "rush."[25]  Around 10 a.m., several friends of Evelyn came over to eat Thanksgiving leftovers.[26]  Evelyn and her friends

---

[16] Evelyn Dep. at 27:25–28:9.

[17] Rios's Exs. at 84–85 (photos of trash bin).

[18] Alcantara Dep. at 62:11–63:4.

[19] Evelyn Dep. 28:13–21, 31:12–15, 87:25–88:6.

[20] *Id.* at 28:13–21; Alcantara Dep. at 62:11–63:4, 109:11–110:1.

[21] Alcantara Dep. at 58:2–4.

[22] *Id.* at 50:1–9, 77:8–14.

[23] *Id.* at 58:2–9, 62:3.

[24] *Id.* at 55:11–15, 58:7–15, 67:1–2, 99:3–4.

[25] *Id.* at 50:4–6.

[26] Evelyn Dep. at 26:7–27:1, 32:9–33:1.

were "chilling" inside the home.[27]  Sometime later, they went outside in the back yard.[28]  At no point did Evelyn or her friends consume any alcohol.[29]  At some point, Alcantara realized that she did not have whipped cream for the pies and left home to get some.[30]  When she left, Evelyn was outside in the yard.[31]  Alcantara testified, she took L.A. and Z.A. with her on her errand for the whipped cream.[32]

At around 1:45 p.m., according to the officers, Rios and Villagran were dispatched to 830 Mission Road in reference to a call made by an anonymous neighbor; the neighbor had called to report that several juveniles were causing riot at that place.[33]  At the time, the officers were unaware that Alcantara and Evelyn lived at that address.  Upon arrival, the officers exited their marked car, heard voices in the back yard—"It was just kids talking loudly"—and walked along the driveway toward the back of the residence.[34]  They entered the back yard through the gate at the end of the driveway; it was "ajar . . . just enough" to make an entry into the yard.[35]

---

[27] *Id*. at 33:19–21.

[28] *Id.* at 34:3–4.

[29] *Id.* at 25:14-18, 29:14-21.

[30] Alcantara Dep. at 50:1–2; 50:8–10, 58:7–10; Evelyn Dep. at 27:2–4, 32:9–19.

[31] Alcantara Dep. at 58:19–60:13.

[32] *Id*. at 96:12–14.  Evelyn's testimony however suggests that her sisters remained at home, while Alcantara was away.  Evelyn Dep. at 35:23–36:12.  It is plausible that her recollection was bit hazy on this point (her deposition was taken more than three years after the incident), and alternatively, that she did not realize at the time that her mother had taken her sisters with her (Evelyn was outside).

[33] Rios Dep. at 8:23–24, 12:11–17; Police Incident Report at 3, ECF No. 94-13.

[34] Rios Dep. at 31:22–32:9; Villagran Dep. at 23:11–15, ECF No. 82-5.

[35] Rios Dep. at 31:22–32:9.

In the back yard, Rios and Villagran found eight teenagers—five boys and three girls.[36]
At the time, the officers were unaware that the teenagers were Evelyn and her friends.  Upon
seeing the teenagers, the officers realized that no riot was in progress.[37]  They did not see any of
teenagers holding or drinking any alcoholic beverage.[38]  No one—neither the teenagers, nor any
other person—told the officers that any of the teenagers had engaged in drinking on that day.[39]
The officers, though, noticed the trash can in the vicinity of where the teenagers were standing
and that it was full of empty cans and boxes of alcoholic beverages.[40]  This could be, Villagran
thought, a case of possible underage drinking.[41]

According to Evelyn, the officer(s) told the teenagers that a call was made about the
teenagers blasting music; but they were not.[42]  Rios asked who lived there, but none of the
teenagers answered.[43]  Evelyn testified that she did not want to answer any question until her
mother came home because she was a minor and anything she would say could be "switched
up."[44]  She did not want to go inside the home because, she thought, the officers would knock on

---

[36] *Id.*; Police Incident Report at 3; Evelyn Dep. at 26:7–20.

[37] Villagran Dep. at 18:11–16; Rios Dep. at 9:12–13.

[38] Rios Dep. at 13:5–17; Villagran's Sworn Statement to Internal Affs. Div. at 5 (para. 6), ECF No. 94-12.

[39] Jasso Dep. at 32:22–33:3.

[40] Rios Dep. at 31:22–32:9; Villagran Dep. at 16:11–14, 29:13–19; Police Incident Report at 3. The photographs taken by Villagran on that day, either with his cell phone or a department-issued cell phone, show that the trash can was located immediately next to the home's back door.  Rios's Exs. at 84–85; Jasso Dep. at 23:8–24:9.

[41] Villagran Dep. at 16:9–10.

[42] Evelyn Dep. at 94:8–16; Rios's Exs. at 142.

[43] Rios Dep. at 14:5; Villagran Dep. at 30:8–9.

[44] Evelyn Dep. at 37:8–13.

the door.[45]  She locked the back door with her key and walked away from the officers and the property; her friends went along with her.[46]  Neither Villagran, nor Rios told the teenagers to stop or not to walk away.[47]

The officers suspected that the teenagers did not have permission to be on that premises and were therefore committing a criminal trespass.[48]  They wanted to find out if someone was inside the home who might tell them whether or not the teenagers had permission to be there.[49]  According to the officers, Rios went to the front of the premises and knocked on the front door, and Villagran stayed in the back yard and knocked on the back door.[50]  As Evelyn was walking away, she heard the officer(s) knock on the back door.[51]  According to a police report which Villagran prepared near the time of the incident, he "heard movement inside," while he was knocking on the back door.[52]  No one inside responded to the officers' knocks.

Believing that the teenagers had been trespassing on the property and potentially been involved in the initial riot call, Rios and Villagran got back in their patrol car and drove toward the direction in which the teenagers were walking.[53]  A few minutes later, the officers pulled the

---

[45] *Id.* at 93:10–15.

[46] *Id*. at 36:1–3, 37:5–7.

[47] Villagran Dep. at 36:17–21.

[48] *Id.* at 40:16–19; Rios Dep. at 32:25–33:4.

[49] Rios Dep. at 33:1–4.

[50] Villagran Dep. at 12:8–21, 31:17–22; Rios Dep. at 32:17–20, 36:1–9.

[51] Evelyn Dep. at 93:20–22.

[52] Police Incident Report at 3.

[53] Rios Dep. at 33:12–14; Rios's Exs. at 6 (Rios's affidavit).

teenagers over on Pueblo Street, a block away from the home and had them sit on the curb of the street.[54]  Rios asked Evelyn for her name and date of birth.[55]  Evelyn felt that she needed her mother present before she could say anything because, again, she was a minor; she never felt comfortable with the police because of the cases she had seen in the news such as Black Lives Matter incidents.[56]  In response to Rios's question, she told him that "I plead the Fifth" and that she did not want to say anything until her mother was present.[57]  Rios reacted by "flick[ing] at [her] with his toe at [her] shin with his boot," though "he didn't use a great amount of force"; she was still sitting on the curb.[58]  Rios told her that she better give him her name.[59]

Moments later, Evelyn stood up and told Rios, "[i]f I'm being held here for no reason, I don't feel like I should be here."[60]  Because she was not told why she was being held, she started walking away.[61]  The parties' accounts of what transpired next among Rios, Villagran, and Evelyn diverge.  According to Evelyn, as she was walking away, Rios grabbed her hoodie, and she felt a pull on her hair, which was inside the hoodie; she fell forward on the concrete of the sidewalk; she had her hands down to break her fall.[62]  Then, when she was trying to push herself

---

[54] Evelyn Dep. at 36:14–16, 37:16–19.

[55] Rios Dep. at 16:9–11; Rios's Exs. at 7 (Rios's affidavit)

[56] Evelyn Dep. at 43:8–44:6.

[57] *Id.* at 42:1–3, 94:20–25; Rios's Exs. at 142.

[58] Evelyn Dep. at 42:10–24.

[59] *Id.* at 43:1.

[60] *Id.* at 44:25–45:10.

[61] *Id.* at 44:25–45:10, 46:2–4.

[62] *Id.* at 46:17–22, 48:21–22, 49:12–13, 96:23–97:4.

back up with her hands, Rios and Villagran grabbed her hands behind her back and pushed her down; she fell forward, again, and this time, one side of her head banged against the concrete.[63] Both officers kneeled on her and handcuffed her behind her back.[64]  (At the time, Rios weighed about 250 pounds, and Evelyn 115 pounds.[65])  After handcuffing her, the officers picked her up by lifting her arm up in her back, took her to their patrol car, and shoved her inside the car on the back seat.[66]

   According to the officers, on the other hand, as Evelyn was walking away, Rios held her wrist, and "she took [her] weight upon herself and fell forward," "eventually end[ing] up on the ground [with her] face up."[67]  While on the ground, she tried to kick Rios in the direction of his groin, though she never struck him.[68]  Rios flipped her over, but she still tried to flip back, face up.[69]  She was actively resisting.[70]  Villagran came over, and with his help, Rios took control of her.[71]  Villagran handcuffed her, lifted her up by her arm, placed her in the back of the patrol car.[72]

---

[63] *Id.* at 47:22, 48:1–23, 49:5–16, 50:10–14, 96:16–18.

[64] *Id.* at 46:17–22.

[65] *Id.* at 109:15–17; Rios Dep. at 27:10–11.

[66] Evelyn Dep. at 77:5–78:17, 100:1–11.

[67] Rios Dep. at 18:6–12, 361–3.

[68] *Id.* at 24:12–13, 36:7–9.

[69] *Id.* at 26:14–19.

[70] *Id.* at 28:10.

[71] *Id.* at 26:19–22.

[72] *Id.* at 18:6–7, 26:22, 28:21–23, 36:10; Villagran Dep. at 40:23–24.

While Evelyn was in the car, other teenagers told the officers that her name was Evelyn, the house, where the officers initially arrived, was hers, and they were just hanging out there.[73] Rios requested a female unit to the scene for a search, and shortly thereafter, a female officer, Elizabeth Saldana arrived.[74]  Jasso arrived at the scene shortly thereafter.[75]  Evelyn was taken out of the car, and Saldana patted her down, while Evelyn was standing by the car; Saldana found Evelyn's house key inside her bra.[76]  Jasso watched Saldana pull the key out of Evelyn's bra.[77] After the pat-down, Evelyn was placed back inside the car.[78]

Rios and Villagran briefed Jasso on what had taken place prior to his arrival.[79]  The officers decided to go back to 830 Mission Road (Evelyn and Alcantara's home).[80]  Jasso and Villagran went.[81]  Upon arriving at the home, they went to the back yard, and Jasso knocked on the back door for "no more than a minute," but no one inside responded to the knocks.[82]  Jasso unlocked the back door with the key they found on Evelyn back at Pueblo Street, and they

---

[73] Rios Dep. at 36:9–13, 40:6–8; Evelyn Dep. at 100:20–23.  *Compare* Rios Dep. at 34:1–6, *with id.* at 41:19–23 (contradicting whether anyone mentioned that it was Evelyn's house before she began to walk away from Rios on Pueblo Street).

[74] *Id.* at 36:14–17, Rios's Sworn Statement to Internal Affs. Div. at 3, ECF No. 94-14; Jasso Dep. at 28:18–20.

[75] Rios Dep. at 36:18; Jasso Dep. at 28:23–29:4.

[76] Evelyn Dep. at 101:17–23; Jasso Dep. at 29:3–4, 36:10–17; Rios Dep. 36:14–17.

[77] Rios Dep. at 36:18; Jasso Dep. at 28:23–29:4, 43:4–11.

[78] Evelyn Dep. at 2–3.

[79] Villagran's Sworn Statement to Internal Affs. Div. at 3; Jasso Dep. at 16:23–17:10.

[80] Jasso Dep. at 45:9–16; Police Incident Report at 3.

[81] Jasso Dep. at 43:18–44:3.

[82] *Id.* at 44:10–14, 51:13–21.

walked into the home.[83]  They had no warrant to enter or search the home.[84]  As they entered,

they had their "weapons drawn."[85]  Once inside, they announced "Police" a couple of times.[86]

At the time, Alcantara was in the bathroom helping L.A. and Z.A. shower and getting

them ready for the Friendsgiving event at her friend's home (she had already returned home from

her errands).[87]  She heard a male voice coming from the living room.[88]  She walked out of the

bathroom to see who that was.[89]  As she was walking toward the living room, L.A, who was

naked, walked out of the bathroom and ran across to Alcantara's bedroom, and Z.A., who was in

a towel, ran behind L.A.[90]  Alcantara looked to the living room and in the back; there, she saw

two people in uniform standing near a dining table in the dining area.[91]

Upon seeing the officers, Alcantara was "overwhelmed" and "upset."[92]  She asked the

officers what they were doing in her home and why would they come in without her consent or

first contacting her.[93]  According to Jasso, she "was yelling at us asking why we were there."[94]

---

[83] *Id*.

[84] *Id*. at 76:12–18.

[85] Jasso's Sworn Statement to Internal Affs. Div. at 6, ECF No. 94-11.

[86] Jasso Dep. at 46:8–11.

[87] Alcantara Dep. at 53:18–25, 58:16–18, 67:1–10.

[88] *Id.* at 53:25–54:1, 68:10–14.

[89] *Id.* at 68:13–19; 69:25–70:5.

[90] *Id.*  at 68:13–19; 69:25–70:5, 75:10–13, 130:1–12.

[91] *Id.* at 71:5–9, 73:8–12, 78:18–19, 88:1–2.

[92] *Id.* at 76:16–17, 81:19.

[93] *Id.* at 76:15–21, 81:4–8.

[94] Jasso Aff. at 3.

According to Alcantara, the officers did not answer her questions and were not doing anything or looking for anything; they were just standing still and said "wait, relax, ma'am."[95]  The two men, she observed, "were smiling and grinning, laughing like it was a joke."[96]  About five minutes after she encountered them, the officers stepped outside of her home.[97]

In the meantime, she called the police non-emergency number, asking to speak to a supervisor because she was not getting an answer, and she was told that they would send a supervisor.[98]  Jasso returned and told Alcantara, "I'm the supervisor.  What do you need to tell me?"[99]  Jasso "was laughing," according to Alcantara.[100]  She asked, "[w]hat were you doing inside my home?" and Jasso responded, "[w]e have your daughter arrested," but did not immediately say where she was.[101]  Jasso went to a neighbor next door to investigate the disturbance call and if any underage drinking was occurring at Alcantara's residence.[102]  He then came back to Alcantara and told her that Evelyn was "around the corner.  All I need is for you to ID her so that we can release her."[103]

---

[95] Alcantara Dep. at 85:15–19, 87:9–13, 93:3–7.

[96] *Id.* at 81:21–22.

[97] *Id.* at 86:9–10, 87:21–22.

[98] *Id.* at 85:25, 92:3, 97:9–14.

[99] *Id.* at 86:7–8.

[100] *Id.*

[101] *Id.* at 93:24–94:7.

[102] *Id.* at 95:19–23; Jasso Aff. at 3.

[103] Jasso Aff. at 3; Alcantara Dep. at 95:19–23.

Around then, Alcantara's friend came by, and she and the friend drove around to the corner on Pueblo Street where other officers and Evelyn were.[104]  Alcantara requested the officers to release Evelyn.[105]  Rios asked for Alcantara's name and date of birth, and Evelyn's as well.[106]  Villagran conducted a warrant check on Evelyn based on the information Alcantara provided, and she was then released to Alcantara.[107]  At some point, the other teenagers provided Rios with their names, Rios conducted a warrant check on each of them, and they too were released.[108]

By the time of her release, Evelyn was held inside the police car for about 40-60 minutes.[109]  During her encounter with the police at Pueblo Street, she suffered pain to her head, marks on her face, bruises and red marks on her wrists, and knee scrapes.[110]  After Evelyn was released, an ambulance took her to a hospital, where she received treatments.[111]

---

[104] Alcantara Dep. at 96:4–11, 98:14–18.

[105] *Id.*

[106] Rios Dep. at 37:9–10.

[107] Police Incident Report at 3; Alcantara Dep. at 102:13–17.

[108] Rios Dep. at 40:10–41:7.

[109] Jasso testified that within minutes after Evelyn was stopped at Pueblo Street, she was handcuffed and placed in the police car. Jasso Dep. at 61:15–62:1.  He further testified that he entered Alcantara's home about 20-30 minutes after Evelyn was handcuffed and placed in the car.  *Id.*  Alcantara testified that Jasso arrived back at Pueblo Street within 30 seconds to one minute after she got there. Alcantara Dep. at 100:10–13.  Finally, Evelyn testified that when her mother arrived at Pueblo Street, the police kept her in custody an additional 20-30 minutes.  Evelyn Dep. at 52:21–53:2.

[110] Evelyn Dep. at 75:5–22, 76:3–9, 78:24–79:3, 85:13–86:18, 97:5–7, 102:11–18; Rios's Exs. at 90, 96–97, 138–41.

[111] Evelyn Dep. at 53:3–22; Alcantara Dep. at 112:2–5; Rios's Exs. at 86–101.

Within days after the incident, Alcantara filed a complaint with the Police Department's Internal Affairs Division.  After conducting its investigation, the Department, in mid-2017, disciplined and reprimanded all three officers for their conduct on November 26, 2016.[112]  Jasso was suspended for 10 hours (one daily shift),[113] and Villagran and Rios each were given two options: either be suspended for 8 hours or undergo further training, among others, on warrantless searches and seizures.[114]

## B.  Procedural Background

In October 2018, Alcantara, on her own behalf and as Evelyn's next friend, and Evelyn (together, hereinafter referred to as Plaintiffs) brought this lawsuit against Rios, Jasso, and Villagran based on 42 U.S.C. §1983, which authorizes suits against state or local officials who violate federally protected civil rights.[115]  Plaintiffs assert claims for violations of their rights secured by the Fourth Amendment to the United States Constitution.  Specifically, Evelyn asserts a claim against Rios and Villagran for unlawful detention and/or arrest and a claim against Rios for use of excessive force; Alcantara asserts a claim against Jasso and Villagran for unlawful entry into and/or search of her home.  Plaintiffs assert two additional claims under the theory of

---

[112] Rios Reply to Resp. to Pls.' Proposed Undisputed Facts at ¶ 21, ECF No. 102; Villagran Reply to Resp. to Pls.' Proposed Undisputed Facts at ¶ 21, ECF No. 105; Jasso Reply to Resp. to Pls.' Proposed Undisputed Facts at ¶ 21, ECF No. 106.

[113] Jasso Dep. at 79:22–80:2.

[114] Education Based Discipline Agreements, ECF Nos. 94-6, 94-7.

[115] Section 1983 provides, in relevant part:

Every person who, under color of [law] . . . subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights . . . secured by the Constitution . . . , shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

28 U.S.C. §1983.

supervisor liability.[116]  Evelyn asserts a supervisor liability claim against Villagran, as Rios's supervisor, for Rios's unlawful detention and/or arrest of Evelyn.  Alcantara asserts a supervisor liability claim against Jasso, as Villagran's supervisor, for Villagran's unlawful entry into and/or search of her home.

In November-December 2020,  Rios, Jasso, and Villagran each filed a motion for summary judgment.  Rios's Mot. for Summ. J., ECF No. 78; Jasso's Mot. for Summ. J., ECF No. 82; Villagran's Mot. for Summ. J., ECF No. 87.  The parties' briefing on the motions was completed by February 2021.  In June 2021, the Court, pursuant to 28 U.S.C. § 636(b)(1)(B), referred the motions to United States Magistrate Judge Leon Schydlower for a report and recommendation.  Order Referring Mots., ECF No. 116.

On August 25, 2021, the magistrate judge issued his Report and Recommendation (ECF No. 118).  On September 8, 2021, Jasso and Villagran filed written objections to the magistrate's Report.  Defs. Jasso & Villagran's Joint Objs. to R&R [hereinafter, Defs.' Objs. to R&R], ECF No. 121.  Rios did not file any objection; nor did Plaintiffs.  On September 22, 2021, Alcantara filed a response to Jasso and Villagran's objections.  Pls.' Resp. to Defs.' Objs., ECF No. 123.

## II.   STANDARD

### A.  Standard for Reviewing a Magistrate's Report and Recommendations

When a party files timely written objections to a magistrate judge's report, the district judge must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1); *see also* Fed.

---

[116] Under Section 1983, a supervisory official may be held liable for constitutional violations committed by his subordinate officers if the supervising official gave a command, signal, or any other form of direction that prompted the subordinates' acts that caused the constitutional violations.  *Pena v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018); *Turner v. Lieutenant Driver*, 848 F.3d 678, 695–96 (5th Cir. 2017); *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008).

R. Civ. P. 72(b)(3); *Warren v. Miles*, 230 F.3d 688, 694 (5th Cir. 2000).  The district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3).  As to any unobjected-to portions of the magistrate judge's report, the district judge applies a "clearly erroneous" and "contrary to law" standard of review.  *United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. 1989).

### B.  Standard for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if and only if proof of its existence might affect the outcome of the case," *Roy v. City of Monroe*, 950 F.3d 245, 254 (5th Cir. 2020), and a dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict" for the nonmoving party, *Amerisure Ins. v. Navigators Ins.*, 611 F.3d 299, 304 (5th Cir. 2010).

In deciding whether a genuine dispute as to material fact exists, a trial court "consider[s] all of the evidence in the record," *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007), "view[s] all facts and evidence in the light most favorable" to the nonmoving party, *Weber v. BNSF Ry.*, 989 F.3d 320, 323 (5th Cir. 2021) (internal quotes omitted), and "draw[s] all reasonable inferences in that party's favor," *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020).  The court however refrains from making credibility determinations or weighing the evidence.  *Turner*, 476 F.3d at 343.  The court "must disregard all evidence favorable to the moving party that the jury is not required to believe and instead only give credence to the evidence favoring the nonmovant and that evidence supporting the moving party that is

uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016) (internal quotes omitted)*; see also Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 167 (5th Cir. 2018) ("[T]he evidence of the nonmovant is to be believed." (cleaned up)).

Procedurally, the party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion[ ] and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (cleaned up).  When the nonmoving party will bear the burden of proof at trial, the moving party may satisfy this responsibility by "pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005); *see also Latimer v. Smithkline & French Labs*., 919 F.2d 301, 303 (5th Cir. 1990).  If the moving party succeeds, "the onus shifts to the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *LHC Grp.*, 773 F.3d at 694 (cleaned up); *see also* Fed. R. Civ. P. 56(c)(1)(A).

### III.   THE MAGISTRATE JUDGE'S RECOMMENDATIONS

In their motions for summary judgment, Defendants request the Court to dismiss Plaintiffs' claims both on merits and qualified immunity grounds.  The magistrate judge recommends that Rios's motion as to Evelyn's excessive force claim should be granted; Rios's and Villagran's motions as to Evelyn's unlawful arrest claim should be denied; and Villagran's motion as to Evelyn's supervisor liability claim should be granted.  R&R at 11, ECF No. 118.

None of the parties filed any objection to the magistrate judge's recommendations on these claims.

Further, the magistrate judge recommends that Jasso's and Villagran's motions as to Alcantara's unlawful entry claim should be denied. *Id.* The magistrate moreover recommends that Jasso's motion as to Alcantara's supervisor liability claim against him for Villagran's unlawful entry should be denied. *Id.* at 10 n.78. Jasso and Villagran filed written objections to these recommendations.

## IV.   DISCUSSION

Because the parties did not file any objection to the magistrate judge's recommendations on Evelyn's unlawful arrest and excessive force claims, the Court reviews for clear error. Having carefully reviewed the Report in light of the record evidence, *see, e.g.*, Part I.A., *ante*, the Court concludes that the magistrate's findings and recommendations as to these claims are not clearly erroneous, nor contrary to law. The Court, therefore, accepts these recommendations. However, because Jasso and Villagran object to the magistrate's recommendations on Alcantara's unlawful entry/search claim, the Court, below, conducts a *de novo* review. Ultimately, the Court accepts the magistrate's recommendations, but adds further legal and factual analyses on the unlawful entry/search claim.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 5–6 (2013); *see also Reichle v. Howards*, 566 U.S. 658, 664 (2012) ("This 'clearly established' standard protects the balance" that the Supreme Court cases have struck "between vindication of [citizens'] constitutional rights and government officials' effective performance of their duties by

ensuring that officials can reasonably anticipate when their conduct may give rise to liability for damages." (cleaned up)). "This doctrine gives government officials breathing room to make reasonable but mistaken judgments[ ] and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 574 U.S. 13, 16–17 (2014) (internal quotes omitted).

 To evaluate whether a government official is entitled to qualified immunity, courts "conduct a two-prong inquiry: we ask (1) whether the undisputed facts and the disputed facts, accepting the plaintiffs' version of the disputed facts as true, constitute a violation of a constitutional right, and (2) whether the defendant's conduct was objectively reasonable in light of clearly established law." *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015) (internal quotes omitted); *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (recapping the two-prong test).

Although nominally qualified immunity is an affirmative defense, *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021), "a good-faith assertion of qualified immunity . . . alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available," *Joseph ex rel. Joseph v. Bartlett*, 981 F.3d 319, 329–30 (5th Cir. 2020). Still, as with any other motions for summary judgment, the court must "draw all inferences in favor of the plaintiff (i.e., the nonmovant)," *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015), and "may not resolve genuine disputes of fact in favor of [the defendant (i.e., the movant)]," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) "And it must properly credit [the plaintiff's] evidence." *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021) (cleaned up).

**A. Alcantara's Unlawful Entry/Search Claim**

*1. Constitutional Violation*

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). The Amendment embodies "centuries-old principle of respect for the privacy of the home." *Wilson*, 526 U.S. at 609–10. "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Jardines*, 569 U.S. at 6 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)); *see also Wilson*, 526 U.S. at 609–10 ("'[T]he house of every one is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose.'" (quoting *Semayne's Case*, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (K.B. 1604))).[117] The Fourth Amendment is also understood to embody a particular concern for government trespass upon home; that concern is animated by common-law property rights:

> "Our law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave; if he does he is a trespasser, though he does no damage at all; if he will tread upon his neighbour's ground, he must justify it by law."

---

[117] The right to retreat has been described in more contemporary language as follows:

"A man can still control a small part of his environment, his house; he can retreat thence from outsiders, secure in the knowledge that they cannot get at him without disobeying the Constitution. That is still a sizable hunk of liberty—worth protecting from encroachment. A sane, decent, civilized society must provide some such oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle."

*Silverman*, 365 U.S. at 511 n.4 (quoting *United States v. On Lee*, 193 F.2d 306, 315–16 (2d Cir. 1951) (Frank J. dissenting)).

*United States v. Jones*, 565 U.S. 400, 405 (2012) (cleaned up) (quoting *Entick v. Carrington*, 95 Eng. Rep. 807, 817 (C.P. 1765)); *see also id.* at 405; *Jardines*, 569 U.S. at 8, 11.  The Supreme Court cases therefore "have firmly established the 'basic principle of Fourth Amendment law that searches . . . inside a home without a warrant are presumptively unreasonable.'"  *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)).

Here it is undisputed that Jasso and Villagran entered Alcantara's home without a warrant or her consent.[118]  Alcantara argues that their entry violated her Fourth Amendment rights.  Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 17 [hereinafter, Pl.'s Resp. to Mots. for Summ. J.], ECF no. 94.  Jasso and Villagran counter that no such violation occurred because their entry "was not intended as a search," and once they entered, they did not "sneak around" or "search anything."  Jasso's Mot. for Summ. J. 11, 15.  They point to Alcantara's deposition testimony that at the time she encountered the officers in her home, they "didn't do a search" and "weren't looking for anything."[119]  In other words, Jasso and Villagran argue that no "search" within the meaning of the Fourth Amendment occurred.

"When the Fourth Amendment was adopted, as now, to 'search' meant to look over or through for the purpose of finding something; to explore; to examine by inspection; as, to *search* the house for a book; to *search* the wood for a thief."  *Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001) (cleaned up).  Under the "common-law trespassory test," *Jones*, 565 U.S. at 409, "[w]hen 'the Government obtains information by physically intruding' on . . . houses . . . 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  *Jardines*, 569

---

[118] Jasso Dep. at 76:12–18.

[119] Alcantara Dep. at 85:15–19, 87:9–13.

U.S. at 5 (quoting *Jones*, 565 U.S. at 406 n.3); *see also id.*, 569 U.S. at 11 ("That the officers

learned what they learned only by physically intruding on Jardines' property to gather evidence

is enough to establish that a search occurred.").

>   As the magistrate judge points out, Jasso testified:

>   There . . . had been a trend of . . . juveniles underage drinking parties that these
>   juveniles would go into homes, *vacant* homes and throw beer parties and in essence
>   . . . trespass on the property and then vandalize the property. . .  Now, based on
>   those circumstances, I wanted to make sure that none [of] that was taking place.
>   And I even explained to [Villagran], said, "[i]f that was your house you would want
>   to make sure that somebody would . . . [be] checking up on it."[120]

Thus, contrary to their arguments, the officers entered the home intending to look for evidence of

trespass, underage drinking, and vandalism.  That is to say, they entered the home to verify

whether any of these criminal activities occurred or was occurring inside the home.  And, once

inside, the officers did verify, at minimum, that the house was not vacant (Alcantara was there)

and no vandalism was occurring.  Therefore, a search within the meaning of the Fourth

Amendment occurred.  *See Jones*, 565 U.S. at 408 n.5 (A search occurs where "[t]respass . . . [is]

conjoined with . . . an attempt to find something or to obtain information."); *id.* at 404

(describing the government's conduct as "physically occup[ying] private property for the

purpose of obtaining information"); *United States v. Karo*, 468 U.S. 705, 715 (1984) ("In this

case, had a DEA agent thought it useful to enter the . . . residence to verify that the ether was

actually in the house and had he done so surreptitiously and without a warrant, there is little

doubt that he would have engaged in an unreasonable search within the meaning of the Fourth

Amendment.").

---

[120] Jasso Dep. at 44:22–45:13 (emphasis added); *see also* R&R at 9.

The officers entered the home additionally to locate a responsible party for Evelyn.[121]  A short time after his initial entry into and exit from the home, Jasso returned to the home "to inform [Alcantara] that her daughter was around the corner and that she needed to identify her so that we could release her."[122]  Once Alcantara arrived at Pueblo Street, Rios ran a warrant check on Evelyn based on the information Alcantara provided,[123] and Jasso "told the officers to release [Evelyn] since we now had a responsible party/parent to release her to."[124]  Under the circumstances, the officers' entry into the home to look for a responsible party for Evelyn constituted a further search within the meaning of the Fourth Amendment.  *See Wernecke v. Garcia*, 591 F.3d 386, 393 (5th Cir. 2009) (stating a child protective service's investigative specialist "indisputably engaged in a search when she entered the . . . home to look for KW," a child); *United States v. Mowatt*, 513 F.3d 395, 400 (4th Cir. 2008) (stating "the officers' requiring [the occupant of a home] to open his door so that they could see him" constituted a search), *abrogated on other grounds by Kentucky v. King*, 563 U.S. 452 (2011).

Next, Jasso and Villagran argue that even if they committed a Fourth Amendment violation, the violation was so insignificant as to be *de minimis*.[125]  Jasso's Mot. for Summ. J. at

---

[121] Police Incident Report at 3.

[122] Jasso Aff. at 3.

[123] Rios Dep. at 37:9–10; Police Incident Report at 3,

[124] Jasso's Sworn Statement to Internal Affs. Div. at 6.

[125] The maxim of *de minimis non curat lex*—translated as "the law does not regard [or concern itself with] trifles," Max L. Veech & Charles R. Moon, *De Minimis Non Curat Lex*, 45 Mich. L. Rev. 537, 538 (1947)—has been applied in a wide variety of civil cases, including constitutional tort cases, *Hessel v. O'Hearn*, 977 F.2d 299, 303 (7th Cir. 1992) (collecting illustrative cases).[125]  The maxim is often used "to denote types of harm, often but not always trivial," for which, courts think, there is no "actionable wrong" and, in constitutional cases, no actionable constitutional violation.  *Id.* at 304.

In the Fourth Amendment context, the maxim is commonly used, at least in some form, in excessive force cases: *de minimis* amount of force used or correlatively, *de minimis* amount of injury

15.  They point out that once they entered the home, they stood in the entryway of the kitchen while communicating with Alcantara, they never left the entryway, and they were in the home for less than five minutes.  *Id.* at 12–15.

The Supreme Court has repeatedly said that "'physical entry of the home is the chief evil against which [the Fourth Amendment] is directed," *Lange v. California*, 141 S. Ct. 2011, 2018 (2021) (quoting *Payton*, 445 U.S. at 585), and that the Amendment draws a "bright" and "'firm line at the entrance to the house,'" *Kyllo*, 533 U.S. at 40 (quoting *Payton*, 445 U.S. at 590).  Yet, "[a] trespass on 'houses' . . . , or a *Katz*[126] invasion of privacy, is not alone a search unless it is done to obtain information; and the obtaining of information is not alone a search unless it is achieved by such a trespass or invasion of privacy."  *Jones*, 565 U.S. at 408 n.5.

But once a trespass "conjoined with . . . an attempt to find something or obtain information" has occurred*, id.*—that is, a "search," has occurred—"measurement of the quality or quantity of information obtained" is of no moment for the Fourth Amendment purposes, *Kyllo*, 533 U.S. at 37.  Nor is measurement of the extent or duration of trespass.  The Supreme Court "made clear that any physical invasion of the structure of the home, 'by even a fraction of an inch' was too much."  *Id.* (quoting *Silverman*, 365 U.S. at 512); *see also id.* ("[T]here is

---

sustained is not cognizable.  *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (cleaned up); *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir.1996); *cf. Lincoln v. Turner*, 874 F.3d 833, 846 n.61 (5th Cir. 2017) ("[W]e need not address whether a more than 'de minimis' injury is still required for a Fourth Amendment excessive force claim in the wake of the Supreme Court's decision in *Wilkins v. Gaddy*, 559 U.S. 34 (2010) (holding that a more than de minimis injury is not required to support an excessive force claim brought under the Eighth Amendment)").  The application of the *de minimis* principle in this context is grounded in the courts' desire to "not permit a cause of action for every contact between a citizen and a police officer."  *Williams v. Bramer*, 180 F.3d 699, 703–04 (5th Cir. 1999); *see also Ikerd*, 101 F.3d at 434 ("In just about every conceivable situation, some amount of force or contact would be too nominal to constitute a constitutional violation.").  Likewise, in the Eighth Amendment excessive force cases, the Fifth Circuit requires that "[t]he amount of force used . . . be more than *de minimis*, provided that the use of force is not of a sort repugnant to the conscience of mankind."  *Cowart v. Erwin*, 837 F.3d 444, 453 (5th Cir. 2016) (internal quotes omitted).

126 *Katz v. United States*, 389 U.S. 347 (1967).

certainly no exception to the warrant requirement for the officer who *barely cracks open the front door* and sees nothing but the nonintimate rug on the vestibule floor." (emphasis added)); *United States v. Berkowitz*, 927 F.2d 1376, 1388 (7th Cir. 1991) ("*Payton* did not draw the line one or two feet into the home; it drew the line at the home's entrance.").

In support of their *de minimis* argument, Jasso and Villagran point to *Artes-Roy v. City of Aspen*, 31 F.3d 958 (10th Cir. 1994), a case on which they also relied in their motions to dismiss at the pleading stage.[127]   In that case, a city building inspector went to plaintiff's home and observed, from a street, several workers working on the roof in violation of a "stop work order." He intended to talk to the workers, tell them about the order, and if they continued to work, issue citations.  He went to the door of the house, pushed open the door, and stepped into the entryway of the house—without a warrant or consent.  While inside and near the door, he encountered the plaintiff and told her to get the workers out of the house.  The Tenth Circuit held that there was no search in violation of the Fourth Amendment because the inspector was not on the premises "to inspect for a violation of the building code" and he "had already seen what [he] considered violations of the stop work order, from outside the premises."  *Artes-Roy*, 31 F.3d at 962.  To hold otherwise, the court explained, "would subject to liability every public official who inadvertently, or by invitation of an unauthorized person, steps inside the door of a private residence."  *Id.*  Stating that the inspector's "intrusion was minimal, even if he was more than one foot inside the entryway," the court opined that even if the inspector's entry itself were treated as a Fourth Amendment violation, "it was a *de minimis* violation."  *Id.* at 962–63.

---

[127] In ruling on their motions to dismiss, the Court discussed *Artes-Roy*, and distinguished the case based on the facts alleged in Plaintiffs' complaint and the arguments the officers made at the time. *E.R. v. Jasso*, No. EP-18-CV-00298-DCG, 2019 WL 3388040, at *8–*9 (W.D. Tex. July 26, 2019). Their present arguments at this stage of the litigation are somewhat different.

*Artes-Roy*, as appears, is a case where "the obtaining of information" was "achieved [not] by . . . a trespass or invasion of privacy," *Jones*, 565 U.S. at 408 n.5, *supra*, and therefore, there was no "search": the officer stepped into the home's entryway but not to inspect for any evidence (he had already seen what he considered violations of the stop work order—from outside the premises).  Unlike in *Artes-Roy*, here, as discussed above, there was a "search."  Jasso and Villagran trespassed into Alcantara's home by unlocking the back door with the key they seized from inside of Evelyn's bra.  A photograph, taken by Alcantara's cell phone moments after she encountered the officers in her dining room, shows that the officers were inside her home by about 6-7 feet from the door.[128]  The officers "had all four of their feet . . . firmly planted [i]n [her] constitutionally protected . . . home." *Jardines*, 569 U.S. at 8.[129]  Unlike the officer in *Artes-Roy*, the officers here entered the home for the purpose of, as discussed above, obtaining evidence of trespass, underage drinking, and vandalism, and finding a responsible party to whom Evelyn could be released.  On this basis alone, *Artes-Roy* is distinguishable.

More, when the officers entered, Alcantara was in the bathroom, helping her two other daughters shower.  And when she heard a male voice, she stepped out of the bathroom to see who he was and found the officers standing in the dining area of her home. [130]  Alcantara testified that as she was walking out of the bathroom, the two daughters stepped out and "just ran across"[131] into Alcantara's bedroom—L.A. (the eleven years old) was naked and Z.A. (the nine

---

[128] Rios's Exs. at 83 (photo); Appendix, *infra*; Alcantara Dep. at 82:20–24.  Alcantara testified that the officers were "all the way . . . inside—at least about 10 feet inside the home."  Alcantara Dep. at 86:11–13.  And, by the time she took the picture, "they were stepping back." *Id*. at 86:23–87:2.

[129] *See also* Alcantara Dep. at 87:2 (testifying that "[b]oth their feet were inside my home.").

[130] *Id*. at 68:13–19; 69:25–70:5, 75:10–13, 130:1–12.

[131] *Id*. at 132:4–9 (internal quotes omitted).

years old) was in a towel.[132]  According to her testimony, there was a straight line of sight from where the officers were standing to her bedroom.[133]  She added, "I don't see how [the officers] couldn't . . . see [L.A.]."[134]

The Court holds that the officers' entry into Alcantara's home cannot be dismissed as *de minimis*.  *See Kyllo*, 533 U.S. at 37 ("In the home, our cases show, *all* details are intimate details, because the entire area is held safe from prying government eyes."); *Jardines*, 569 U.S. at 6 (A man's "right . . . to retreat into his own home" that is at the core of the Fourth Amendment "would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window."); *cf. Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002) ("No invasion of the sanctity of the home can be dismissed as *de minimis*.").

In sum, Jasso and Villagran's entry into Alcantara's home without a warrant violated her Fourth Amendment rights—unless the entry was justified by exigent circumstances.  The Court therefore turns to the officers' exigency argument.

Jasso and Villagran claim that their warrantless entry was justified because they entered the home to conduct a "welfare check."  Jasso's Mot. for Summ. J. at 12, 14; *cf. Brigham City, Utah v. Stuart*, 547 U.S. 398, 406 (2006) ("The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties."). Specifically, they say, they were worried that someone inside could be injured or in need of emergency assistance because upon their initial arrival to the house (1) they saw, in the backyard, a group of teenagers and a trash can full of empty beer cans and bottles, (2) they knocked on the doors but received no

---

[132] *Id.* at 68:13–19; 69:25–70:5, 75:10–13, 130:1–12.

[133] *See id.* at 70:14–17, 71:20–71:2, 131:10–14.

[134] *Id.* at 131:10–21.

response, and (3) while knocking on the back door, Villagran heard movements or noises inside. Villagran's Mot. for Summ. J. at 21; Jasso's Mot. for Summ. J. at 14; Jasso's Reply in Supp. of His Mot. for Summ. J. at 6–7 [hereinafter , Jasso's Reply to Mot. for Summ. J.], ECF No. 110.[135]

Because the ultimate touchstone of the Fourth Amendment is reasonableness, the warrant requirement for entry of the home is subject to "certain reasonable exceptions." *King*, 563 U.S. at 459.[136]  One well-recognized exception is the exigent circumstances exception: It applies when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable." *Id.* (internal quotes omitted); *see also Groh*, 540 U.S. at 564 ("[A]bsent consent or exigency, a warrantless search of the home is presumptively unconstitutional.").  The Supreme Court "has identified several exigencies that may justify a warrantless search of a home." *Kentucky*, 563 U.S. at 460.  For example, "law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause, to prevent the imminent destruction of evidence, or to engage in 'hot pursuit' of a fleeing suspect." *Brigham City*, 547 U.S. at 403 (internal citations omitted).

And, as relevant here, under the "emergency aid" exception, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.*[137]  The exception does not depend on the officers'

---

[135] *See also* Jasso's Sworn Statement to Internal Affs. Div. at 5 (para. 10) (stating the reasons for "welfare check"); *id.* at 6 (para. 15.a) (same).

[136] The Supreme Court has repeatedly declined to create new exceptions and to "expand the scope of [the existing] exceptions to the warrant requirement to permit warrantless entry into the home." *Caniglia v. Strom*, 141 S. Ct. 1596, 1600 (2021) (cleaned up); *see also e.g.*, *id.* at 1598 (declining to create a standalone "community caretaking exception"); *Mincey v. Arizona*, 437 U.S. 385, 395 (1978) (declining to create a categorical "murder scene exception"); *Collins v. Virginia*, 138 S. Ct. 1663, 1673 (2018) (declining to extend the automobile exception to permit a warrantless intrusion on a home or its curtilage).

[137] Jasso's Mot. for Summ. J. at 1, 14 (asserting emergency aid doctrine); Jasso's Reply to Mot. for Summ. J. at 7 (same).  The Court notes that in their objections to the magistrate's Report, Jasso and

subjective motivations. *Id.* at 404.  Under it, warrantless entry is justified, if, given "the totality of circumstances confronting the officer as he decides to make a warrantless entry," *Lange*, 141 S. Ct. at 2018 (internal quotes omitted), there was "an objectively reasonable basis for believing that a person within the house is in need of immediate aid," *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (same); *see also id.* at 49 ("[T]he test . . . is . . . whether there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger." (internal quotes omitted)).  As important, "[b]ecause a warrantless entry into a home is presumed to be unreasonable, the officer has the burden of proving that the warrantless search was conducted pursuant to an exception." *Carroll*, 800 F.3d at 172 (cleaned up) (a qualified immunity case); *see also Linicomn v. Hill*, 902 F.3d 529, 536 (5th Cir. 2018) (stating "the officers had the burden of proving the existence of exigency") (a qualified immunity case).[138]

---

Villagran, for the first time, appear to assert a new ground for exigency: their entry to "ensur[e] that *vandalism* was not or had not occurred inside the home would be a justification under the exigent circumstances exception to the Fourth Amendment." Defs.' Objs. to R&R at 8 (emphasis added).  In their motion briefs, the officers made no mention of vandalism, let alone an exigency based on vandalism.  In addressing the officers' argument that their entry was not intended as a search (discussed above), the magistrate judge, it appears, sifted through the transcripts of the officers' deposition testimony (no doubt, a herculean effort), found Jasso's testimony referencing vandalism, and wrote: "I note the foregoing testimony about a desire to inspect the residence's interior for evidence of, or damage from, juvenile vandalism belies the argument that Villagran and Jasso now make that they did not intend to 'search' the residence." R&R at 9 (citing Jasso Dep. at 44–45).  The magistrate's discussion may have prompted the officers to now assert the new ground.

Be that as it may, other than laboring on a single sentence (quoted above, in this paragraph), the officers, who have the burden on exigency, provide no analysis on this new ground.  The Court declines to address it. *See El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in a skeletal way, leaving the court to put flesh on its bones." (cleaned up)); *See Sanchez v. Gomez*, No. EP-17-CV-00133-PRM, 2017 WL 3842137, at *6 (W.D. Tex. Sept. 1, 2017) (Martinez, J.) (stating "[d]efendants' last-ditch, 'spaghetti-on-the-wall' approach to arguing an applicable exception is unorganized and confusing").

[138] Jasso and Villagran improperly attempt to shift this burden to Alcantara.  They argue "Plaintiff cannot show that there was no justification for Sgt. Jasso's entry into the home." *E.g.*, Jasso's Mot. for Summ. J. at 12.  They add: "In order to prove the first prong [of the qualified immunity test], Plaintiffs must show that . . . there was no emergency or justification." *Id.* at 9 (citing *Rockwell v. Brown*, 664 F.3d 985, 994 (5th Cir. 2011)).  *Rockwell* stands for no such proposition.

Two Supreme Court opinions illustrate the application of the emergency aid exception. One is *Brigham City*.  There, in the early hours of a morning, police officers responded to complaints about a loud party at a house.  "As they approached the house, they could hear from within an altercation occurring, some kind of fight"; it was "loud" and "tumultuous."  *Brigham City*, 547 U.S. at 406 (internal quotes omitted).  They found two juveniles drinking beer in the backyard.  Through a window, they saw a fight unfolding inside the kitchen: Four adults were attempting, with some difficulty, to restrain a juvenile, who had his fists clenched, but eventually, the juvenile broke free and punched another adult in his face, causing the latter to spit blood.  At this point, the officers entered the kitchen.  Under these circumstances, the Court found it "plainly reasonable" for the officers to enter the house and stop the violence, because they "had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning."  *Id.*

*Fisher* is the other.  There, police officers responded to a disturbance complaint.  When they approached the area, a couple directed them to a house where a man was "going crazy." *Fisher*, 558 U.S. at 45.  They found the house in "considerable chaos": broken house windows, the glass still on the ground outside, a pickup truck with its front smashed, damaged fenceposts, and blood on the hood of the truck and on clothes inside it.  *Id.* at 45–46.  Through a window, the officers saw a man inside "screaming and throwing things" and that the man had a cut on his hand.  *Id.* at 46.  They knocked, but the man refused to answer.  One officer pushed the front door partway open in an attempt to enter the house but saw the man pointing a gun at him; so, the officer withdrew.  The Supreme Court observed: upon arrival, the officers encountered "a tumultuous situation in the house," found "signs of a recent injury, perhaps from a car accident," and saw "violent behavior inside" (the man screaming and throwing things).  *Id.* at 48.  It held

"[i]t would be objectively reasonable to believe that [the man's] projectiles might have a human target (perhaps a spouse or a child), or that [he] would hurt himself in the course of his rage," and therefore, the officer's entry was reasonable.  *Id.*

The Fifth Circuit "ha[s] declined to apply the emergency aid exception absent *strong evidence* of an emergency at the scene or an imminent need for medical attention."  *Linicomn*, 902 F.3d at 536 (emphasis added) (discussing, among others, *United States v. Troop*, 514 F.3d 405 (5th Cir. 2008), as an illustrative case).  In *Troop*, around 10 p.m. on a Texas summer night, a border patrol officer saw a vehicle drop off several individuals at a location known to be used by alien smugglers.  He radioed for help and within minutes, several agents arrived.  They found the footprints of five individuals that they suspected were illegal aliens; they began to track them.  As the tracks drew near to a town five miles away, the "footprints became more scuffed and had less pronounced toe indentations than at first," indicating that the aliens were "fatigued." *Troop*, 514 F.3d at 407–08.  The temperature that night was in the nineties, and that summer, seven illegal aliens had already died from dehydration and exposure in the surrounding area.

The tracks led the agents to the back of a house through an open gate.  One agent knocked on the back door multiple times, announcing "Border Patrol," but no one inside responded; another agent did the same at the front door with the same result.  Two other agents shone a flashlight through a bedroom window and saw two individuals, fully dressed, asleep on a bed; they shouted, "Wake up, Border Patrol," but received no response.  *Id.* at 408.  Climbing through the window, the agents entered the home "to make sure the men were all right."  *Id.*  The Fifth Circuit held that absent "evidence of medical distress requiring immediate aid, such as loss of blood, signs of physical illness, or evidence that an individual had to be carried or dragged"— the signs of fatigue and the occupants' failure to respond to the agents' knocks and calls were

- 31 -

insufficient to support "a reasonable belief that the suspected aliens were in need of immediate medical aid." *Id.* at 410–11.  The court concluded that there were no exigent circumstances that permitted the warrantless entry.  *Id.* at 411.

The Fifth Circuit reached the opposite conclusion in *Rice v. ReliaStar Life Ins.*, 770 F.3d 1122 (5th Cir. 2014).  There, police officers responded to a 911 call by a man's nephew, who reported that the man was sitting in his truck with a loaded gun to his head and threatening to commit suicide.  After the officers arrived at the man's home, the nephew told them that the man was armed, had been drinking, and had taken a lot of medications.  One of the officers entered the home without a warrant and found the man sitting in a truck in his garage with a gun to his head.  Based on these facts, the Fifth Circuit held that prior to the entry, the officer "had an objectively reasonable belief that [the man] would imminently seriously injure himself" and that "he needed to protect [the man] from imminent injury."  *Rice*, 770 F.3d at 1132.  The panel concluded that the officer did not violate the man's Fourth Amendment rights when he entered the man's home without a warrant.  *Id.*; *see also Tamez v. City of San Marcos, Tex.*, 118 F.3d 1085, 1093–97 (5th Cir. 1997) (police responding to a "shots fired" call could reasonably believe the resident of a home was in danger).

Here, the officers, unlike the officers in *Brigham City* and *Fisher*, did not encounter a tumultuous or chaotic scene when they initially arrived at Alcantara's residence.  Villagran and Rios were responding to an anonymous neighbor's call that several juveniles were causing a "riot" at that residence.[139]  But when they arrived there and spotted the teenagers in the back yard, the officers' testified, they immediately realized that there was no riot.[140]  The officers

---

[139] Police Incident Report at 3.

[140] Villagran Dep. at 18:11–16; Rios Dep. at 9:12–13, 11:6–8.

noticed a trash can full of empty cans and boxes of alcoholic beverages, but did not observe anyone holding, much less drinking, any alcoholic beverage; no one reported that they had been drinking either.[141]  After the officers asked who lived there, but received no response, the officers saw a teenager (Evelyn) lock the back door and then, along with the other teenagers, walk away from the premises—without any incident (the officers did not stop the teenagers).[142] There is no evidence that the officers observed any violent behavior.  A reasonable jury could conclude that the scene the officers encountered was rather calm.

Turning to the non-responsive knocks, as the teenagers were walking away, Villagran knocked on the back door and Rios on the front door, but they received no response.[143] Certainly, the failure of anyone to answer the door in response to the officers' knocks, without more, does not give rise to an emergency.  *See King*, 563 U.S. at 469–70 ("When law enforcement officers who are not armed with a warrant knock on a door . . . , the occupant has no obligation to open the door or to speak. . . . And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time."); *Troop*, 514 F.3d at 410 ("Without any objective evidence of physical distress, the failure of anyone to respond to the agents' knocking at the front and back doors of [the] house also becomes insufficient to create exigent circumstances.").

---

[141] Rios Dep. at 13:1–17, 31:22–32:9; Villagran Dep. at 16:11–14, 29:13–19; Jasso Dep. at 32:18–33:3; Police Incident Report at 3; Villagran's Sworn Statement to Internal Affs. Div. at 5 (para 6).

[142] Villagran Dep. at 31:9–32:11, 36:17–21; Evelyn Dep. at 36:1–3, 37:5–7.

[143] Villagran Dep. at 12:8–21, 31:17–22; Rios Dep. at 32:17–20, 36:1–9.

The officers also argue that the movement or noise emanating from inside the home added to the mix of the circumstances giving rise to a reasonable belief of exigency.  According to the police incident report, which, as mentioned, Villagran prepared, the "[o]fficers heard movement inside," when they were knocking on the doors.[144]  Villagran testified that when he heard the noise, he did not know exactly what that noise was.[145]  He added that he suspected "a number of things" inside the home, including that "somebody [had] gotten assaulted or somebody was heavily intoxicated."[146]  At his deposition, regarding the nature of the noise, he speculated as follows:

> Q.  What were you hearing inside?
>
> A.  Not exactly sure what it was, but I can only describe it as a -- I guess dragging noise, something or someone being dragged inside the house.
>
> Q.  Oh, someone being dragged inside the house?
>
> A.  Something or someone being dragged.[147]

About the noise, a few observations follow.  According to the officers' testimonies, only Villagran heard the movement or noise (he was at the back door), and in turn, he told Rios (he was at the front door) what he heard and much later, told Jasso at Pueblo Street.[148]  After hearing the noise, Villagran, together with Rios, left the premises to look for the teenagers, and about 20-30 minutes later, Villagran, this time accompanied by Jasso, returned to Alcantara's house—

---

[144] Police Incident Report at 3.

[145] Villagran Dep. at 37:16–18.

[146] *Id.* at 37:16–22, 38:11–14.

[147] *Id.* at 32:12–17.

[148] Villagran Dep. at 35:22–36:9; Rios Dep. at 35:3–7; Jasso Dep. at 60:3–61:14; *see also* Villagran Aff. at 7.

armed with the key the officers found in Evelyn's bra.[149]   Jasso testified that when he knocked

on the back door before entering the home, he did not hear any noise, much less the sort of noise

Villagran heard earlier.[150]

       In any event, the sound or noise was too vague to form the basis of a reasonable belief

that someone inside was in danger or needed immediate medical assistance.  *Cf. United States v.

Etchin*, 614 F.3d 726, 734 (7th Cir. 2010) (stating, that the officer heard a man's voice inside is

"too vague" to justify a finding that there was an ongoing crime in the house requiring immediate

entry).  "Some noise is normal to ordinary living," so, merely hearing some noise inside is not

sufficient to create exigent circumstances.  *United States v. Mendonsa*, 989 F.2d 366, 370–71

(9th Cir. 1993) (holding there were not exigent circumstances to justify an entry where the

officers heard only generic nondescript noise).

       The Court finds that the overfilled trash can (two days after the Thanksgiving day), the

nonresponse to the officers' knocks, and the vague noise do not add up to a reasonable belief that

an occupant inside was in imminent need for medical attention or in danger.  *See Troop*, 514

F.3d at 410–11 (holding evidence of fatigue and failure to respond to knocks and calls, absent

evidence of medical distress, was insufficient to support the emergency aid exception); *United

States v. Martinez*, 643 F.3d 1292, 1297–98 (10th Cir. 2011) (holding evidence insufficient to

support the emergency aid exception, stating that "the messy state of the house" did not "add

much to the equation," because "[a] person's failure to keep an orderly home should not subject

him or her to a warrantless search by police").  Moreover, there is no evidence that prior to the

officers' entry, anyone ever reported that someone inside the home was injured, about to be

---

[149] Jasso Dep. at 16:23–17:10, 60:3–61:23.

[150] *Id.* at 28:23–29:4, 43:4–44:14, 51:13–21; *see also id*. at 60:3–61:14.

injured, in danger, or otherwise in need of assistance.  Indeed, Villagran testified that he did not

know if anyone inside was injured or harmed or what was going on inside.[151]  There simply is no

"objective evidence" *Troop*, 514 F.3d at 410, much less any "strong evidence" of an emergency

or an imminent need for medical attention, *Linicomn*, 902 F.3d at 536 (discussing *Troop*), *supra.*

      Taking all the circumstances into consideration and viewing the evidence in the light

most favorable to Alcantara, a reasonable jury could find that the officers' warrantless entry here

was not justified by the emergency aid exception and therefore violated Alcantara's Fourth

Amendment rights.   *See King*, 563 U.S. at 470 ("Any warrantless entry based on exigent

circumstances must, of course, be supported by a genuine exigency."); *United States v.

Menchaca-Castruita*, 587 F.3d 283, 295 (5th Cir. 2009) ("A finding of exigent circumstances . . .

must be based on more than a mere possibility.").

## 2.  *Clearly Established Law*

      Jasso and Villagran argue that Alcantara failed to carry her burden to show that they

violated "clearly established" law.  Defs.' Objs. to R&R at 5.  Specifically, they say she cited no

cases which show that under similar circumstances, an officer was held to have violated the

Fourth Amendment.  *Id.* at 5–6.  Therefore, they argue, the magistrate judge was incorrect in

determining that the officers were not entitled to qualified immunity.  *Id.* at 12.

      "'Clearly established' means that, at the time of the officer's conduct, the law was

sufficiently clear that every reasonable official would understand that what he is doing is

unlawful."  *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotes omitted).  The "'clearly

established law' should not be defined at a high level of generality," but must instead "be

---

[151] Villagran Dep. at 33:13–17, 61:4–9.

particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (same).[152]

"Of course, general statements of the law are not inherently incapable of giving fair and clear

warning to officers." *Id.* (same).  In the rare "obvious case," "a general constitutional rule

already identified in the decisional law may apply with obvious clarity to the specific conduct in

question," *United States v. Lanier*, 520 U.S. 259, 271 (1997), "even though existing precedent

does not address similar circumstances," *Wesby* 138 S. Ct. at 590; *see also Taylor v. Riojas*, 141

S. Ct. 52, 53–54 (2020); *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002); *Pierce v. Smith*, 117 F.3d

866, 882 (5th Cir. 1997) ("We also recognize that the egregiousness and outrageousness of

certain conduct may suffice to obviously locate it within the area proscribed by a more general

constitutional rule.").

   "The plaintiff has the burden to point out clearly established law."  *Tucker*, 998 F.3d at

173; *see also Joseph*, 981 F.3d at 329 (stating, at least in this circuit, a Section 1983 plaintiff has

"the additional burden to show that the violated right was 'clearly established' at the time of the

alleged violation").  "This requires the plaintiff to identify a case—usually, a body of relevant

case law—in which an officer acting under similar circumstances was held to have violated the

Constitution." *Joseph*, 981 F.3d at 330 (cleaned up).[153]  In an "obvious case," however, case law

addressing "similar circumstances" is not needed.  *Id.* at 330 (citing *Wesby* 138 S. Ct. at 590).

---

[152] *See also Anderson v. Creighton,* 483 U.S. 635, 640–41 (1987) (noting, with disapproval, that "[t]he Court of Appeals' brief discussion of qualified immunity consisted of little more than an assertion that a general right [the officer] was alleged to have violated—the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances—was clearly established" and the appellate court's "refusal to consider the argument that it was not clearly established that the circumstances with which [the officer] was confronted did not constitute probable cause and exigent circumstances").

[153] *See also Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) ("[W]e must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." (cleaned up)).  However, "[a] case directly on point is not required." *Trent*, 776 F.3d at 383.  Rather, "the central concept is that of 'fair warning': The law can be clearly established despite notable factual distinctions between the precedents

Here, Alcantara relies on the general principle that absent consent or exigency, a warrantless intrusion into an individual's home is presumptively unreasonable, Pl.'s Resp. to Mot. for Summ. J. at 17, and a couple of pre-2016 cases that suggest that the officer had fair notice that their conduct was unlawful, *see id.* at 18–19.  The magistrate judge appears to rely on the same general principle but further on, among others, *Brigham City*.  R&R at 8, 10.

The Court finds that this is an obvious case where no reasonable officer could have concluded that it was constitutionally permissible to enter Alcantara's home.  The following few general principles, all well established at the time of the officers' entry, gave clear warning that in the circumstances the officers confronted (vague sound and nonresponse to knocks following a rather clam encounter with the teenagers and the overfilled trash can in the back yards), the emergency aid exigency was inapplicable rendering the entry unlawful.  The Fourth Amendment prohibits warrantless entry into a home for the purpose of a search, *see Payton*, 445 U.S. at 586–88, unless "one of a carefully defined set of exceptions based on the presence of 'exigent circumstances'" applies, *id.* at 586 n.25 (internal quotes omitted); under the emergency aid exception, a category of exigent circumstances exceptions, a warrantless entry is permitted "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury," *Fisher*, 558 U.S. at 47 (same), but to apply, the exception requires "genuine exigency," *King*, 563 U.S. at 470.  The obviousness is also informed by the applications of the exception in *Brigham City*, 547 U.S. at 406–07, *Fisher*, 558 U.S. at 49, and *Troop*, 514 F.3d at 410–11—all of which were decided before the officers' entry into Alcantara's home.

---

relied on and the cases then before the [c]ourt, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."  *Id.*

The Court therefore concludes that Jasso and Villagran are not entitled to qualified immunity on Alcantara's claim for unlawful entry into and/or search of her home. Their motions for summary judgment as to this claim is denied.

## B. Alcantara's Supervisor Liability Claim

As to Alcantara's supervisor liability claim against Jasso predicated on Villagran's unlawful entry, Jasso argues only that the officers' entry did not violate her Fourth Amendment rights and even if it did, the violation is *de minimis*. Jasso's Mot. for Summ. J. at 15–16. As the magistrate judge points out, Villagran testified that Jasso, his supervisor, ordered Villagran to enter the residence.[154] Because, as discussed, the Court has found that officers' entry violated the Fourth Amendment and the violation was not *de minimis*, Jasso's motion for summary judgment is denied as to this supervisor liability claim.

## V.   CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that United States Magistrate Judge Leon Schydlower's Report and Recommendation (ECF No. 118) is **ACCEPTED**.

**IT IS FURTHER ORDERED** that Defendant Jose Rios's Motion for Summary Judgment (ECF No. 78) and Defendant Ricardo Villagran's Motion for Summary Judgment (ECF No. 87), each, are **GRANTED IN PART and DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendant Marco Jasso's Motion for Summary Judgment (ECF No. 82) is **DENIED**.

---

[154] R&R at 10 & n.78 (citing Villagran Dep. at 57:12–58:4). Relatedly, Jasso and Villagran complain that in denying Jasso's motion as to Alcantara's supervisor liability claim, the magistrate judge "even based his decision . . . on evidence in the record that Plaintiff did not cite to in her Response" to their summary judgment motions. Defs.' Objs. to R&R at 5. There is a simple explanation: on a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

**IT IS THEREFORE ORDERED** that Plaintiff Evelyn Ramirez's excessive force claim and supervisor liability claim are **DISMISSED**.  Evelyn's unlawful arrest claim, and Alcantara's unlawful entry/search and supervisor liability claims **SHALL PROCEED TO TRIAL BY JURY**.

So **ORDERED** and **SIGNED** this __30th__ day of November 2021.

DAVID C. GUADERRAMA
UNITED STATES DISTRICT JUDGE

**APPENDIX**

The below photograph is reproduced from an exhibit Officer Rios submitted in support of his motion for summary judgment.   *See* Rios Exs. at 83, ECF No. 78-1.

